Argued December 20, 1916, reversed January 16, 1917.

## ROSE v. PORT OF PORTLAND.*

(162 Pac. 498.)

**Constitutional Law—Initiated Amendments—Construction.**

1. In the construction of initiated constitutional amendments, the intent of the people should be ascertained and given full effect, without straining any of the language, or distorting it, or giving it an unnatural meaning, but according every word, clause and sentence whatever consistent meaning the context naturally suggests.

> [As to construction of initiative or referendum provisions in Constitution, statute or municipal charter, see note in Ann. Cas. 1916B, 819.]

**Constitutional Law—Initiated Amendments—Construction Together.**

2. Initiated constitutional amendments adopted by the electorate at the same time must be construed together.

**Municipal Corporations—Powers—Construction.**

3. To the extent that attributes of sovereignty are granted to local subdivisions, the language carrying the grant should be strictly construed, as such grant is a limitation upon the power of legislation.

**Municipal Corporations — Port — Initiative Amendment of Charter— Constitutional and Statutory Provisions.**

4. Laws of 1901, page 417 (Sections 6076-6105, L. O. L.), revising all previous legislation as to the creation of the Port of Portland as a municipal corporation by Section 6078, empowers the port to improve the harbor in the Willamette River "at the City of Portland," and by Section 6079 empowers it to control the river in the harbor "at the City of Portland," and further grants the right to make regu-

---

· *On initiative and referendum generally, see comprehensive note in 50 L. R. A. (N. S.) 204.                    REPORTER.

lations for the navigation "of said harbor in said City of Portland"; and in 1912 the legal voters of the port, acting on an initiative petition, attempted to amend their charter by including the power to dredge a slough in the Columbia River within the port, but outside the city limits. Article XI, Section 2, of the Constitution as amended and adopted in 1906, provides that corporations may be formed under general laws, but shall not be created by special laws, and that the legislative assembly shall not enact or amend any charter for any municipality, city or town, and grants the legal voters of every city and town power to amend their municipal charter, and Article IV, Section 1a, of the Constitution as amended and adopted at the same time, provides that the initiative and referendum powers reserved by the Constitution shall be reserved to the legal voters of every municipality and district as to all the special and municipal legislation, and that the manner of exercising such powers shall be prescribed by general laws, except that cities and towns may provide the manner of exercising such powers as to their municipal legislation, and Article IV, Section 1 of the Constitution as amended and adopted in 1902, declares that the legislative authority of the state shall be vested in a legislative assembly, and reserves to the people power to propose laws and constitutional amendments and to enact them at the polls, and reserves power to approve or reject legislative acts. *Held* that charters or laws, granting or enumerating the powers exercisable by a corporation, are indispensable, and that while cities and towns can enact or amend their own charters, no other corporation, such as a port, can, without an enabling act, legislate power unto itself to legislate, so as to amend its charter or act of incorporation.

**Municipal Corporations— Statutes — Port — Amendment of Charter— Legislative Power—"Referendum"—"Any."**

5. Article IV, Section 1a, of the Constitution as amended and adopted in 1906, provides that the initiative and referendum powers reserved to the people by the Constitution shall be further reserved to the legal voters of any municipality and district as to all special and municipal legislation; that the manner of exercising such powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation, and Article XI, Section 2, of the Constitution as amended and adopted in 1906, provides that corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws, and that the assembly shall not enact or amend any charter or act of incorporation for any municipality, city or town, and that the legal voters of every city and town may enact or amend their municipal charter subject to the Constitution. *Held,* that the word "referendum" of itself implies the existence of a law-making body other than the legal voters; that the word "any" may sometimes signify "every" or "all," but primarily means one individually out of a number, and is a derivative of one signifying an indeterminate unit, or number of units out of many or all; and that, in view of the history and purpose of the amendment, the legislative assembly, while it cannot enact a special measure, amending a city or town charter, may enact a special law, amending the charter or act of incorporation of a municipality other than a city or town, such as a port, and that if the assembly passes a special measure for a municipality other than a city or town, its legal voters can apply the referendum to that measure.

Judgment—Persons Concluded—Municipalities.

6. A judgment for or against a municipal corporation in a suit concerning a matter of general interest is binding, not only on the municipality and its officers, but also upon citizens or taxpayers in so far as it concerns their interests as members of the general public, and a judgment between certain residents or taxpayers and a municipality may be conclusive on all other citizens similarly situated.

Judgment—Conclusiveness—Appellate Court.

7. The decision of an appellate court is conclusive upon the parties as to the matter adjudged in subsequent litigation between them in the same or any other court, and this is true even though the appellate court has since decided differently in other cases.

From Multnomah: GEORGE N. DAVIS, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

The object of this suit is to determine whether the Port of Portland can lawfully expend its funds in dredging and improving Oregon Slough. Hayden Island divides the waters of the Columbia River, as they move westward to the sea, so that a portion of the stream passes along the south side of the island through what is known as Oregon Slough and the remainder flows through the main channel along the north side until it reaches the lower end of the island where all the waters are again united. The lines traced by the Columbia and Willamette Rivers may be likened to the letter Y. The Willamette forms one arm of the Y by flowing through the City of Portland and running in a northwesterly direction until it empties into the Columbia; and the other arm of the Y is supplied by the Columbia. The stem of the Y is drawn by the Columbia running westward from the confluence of the rivers to the sea. The arms of the Y inclose a body of land which is known as the Peninsula district and upon which many large and important industries are located. Oregon Slough is in the arm of the Y formed by the Columbia River and consequently the confluence of the two

rivers is west of and below Hayden Island and Oregon Slough. Many of the industries which have been established in the Peninsula district are located on or near Oregon Slough and need the use and development of the harbor in Oregon Slough for the purpose of promoting their business interests. Oregon Slough is within the boundary lines of the Port of Portland, but it is not included within the limits of the City of Portland.

The legislature created the Port of Portland in 1891 by an act which declares in Section 2 that the object of the port "shall be to so improve the Willamette River at the cities of Portland, East Portland and Albina (now united and known as the City of Portland), and the Willamette and Columbia Rivers between said cities and the sea". Laws of 1891, p. 791. Afterwards, the legislative assembly revised all previous legislation and merged it into a single enactment which is found in Laws of 1901 page 417, and is codified in Sections 6076 to 6105 L. O. L. inclusive. Section 3 of the act (Section 6078 L. O. L.) gives the port "power to so improve the harbor in the Willamette River at the City of Portland, and the channel of the Willamette and Columbia Rivers between said harbor and the sea;" Section 4 (Section 6079 L. O. L.) repeats the limitation, found in Section 3, when power is granted to control the Willamette River "in the harbor at the City of Portland, and of the Willamette and Columbia Rivers between said harbor and the sea;" and the same restriction appears in the language which grants the right to make rules and regulations for the navigation and use "of said harbor in said City of Portland" or of the Willamette and Columbia Rivers "between said harbor and the sea."

At an election held in 1908, the legal voters of the port adopted an initiative petition to include the power to maintain a towage and pilotage service between the port and the open sea; and in *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145), this court ruled that the amendment was legally adopted.

Acting upon an initiative petition the legal voters of the Port of Portland at an election held on November 5, 1912, attempted to amend their charter or act of incorporation by including the power to dredge Oregon Slough and since that time considerable sums have been expended in the improvement of that waterway. On October 5, 1916, the port commissioners directed the general manager to place a dredge in Oregon Slough and proceed to make a channel of a prescribed depth. The plaintiff questions the right of the port to expend money on that intended improvement.

The complaint declares that the defendant intends to carry out the resolution passed by the commissioners and asks that the port be enjoined from using any funds in the improvement of Oregon Slough. The port demurred to the complaint and owners of some of the industries interested in the development of the waterway intervened and answered. Their answer in substance avers that the improvement of Oregon Slough is necessary for their enterprises; that they have contributed large sums which have been used for improving the slough; and that they made these contributions, established their plants and made their investments in reliance upon the decision in *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145), holding that the port could amend its charter. The plaintiff demurred to the answer of the interveners. After the court sustained the demurrer to the complaint and overruled the one to the answer, the plaintiff declined

82 Or.—35

to plead further and then appealed from the consequent decree dismissing the suit.

REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. M. E. Crumpacker.*

For respondents, the Port of Portland and its commissioners, there was a brief over the name of *Messrs. Wood, Montague, Hunt & Cookingham,* with oral arguments by *Mr. Erskine Wood* and *Mr. Richard W. Montague.*

For respondents and interveners there was a brief over the names of *Messrs. Carey & Kerr* and *Mr. Omar C. Spencer,* with oral arguments by *Mr. James B. Kerr* and *Mr. Spencer.*

MR. JUSTICE HARRIS delivered the opinion of the court.

It is plain, and counsel for the port concede, that the legislative act of 1901 does not empower the Port of Portland to improve Oregon Slough for the reason that it is outside the limits of the City of Portland and is at a point on the Columbia River above and east of the mouth of the Willamette River, and is not any part of "the harbor in the Willamette at the City of Portland" and is no part of "the channel of the Willamette and Columbia Rivers between said harbor and the sea"; and, therefore, no funds can be expended in the improvement of Oregon Slough unless the charter was amended in 1912. The steps taken to bring about the election and attempted amendment in 1912 were regular in all respects and the only question involved is whether the legal voters of a port can amend their own charter. If the voters of the port cannot on their own initiative, and without a

law granting power or an enabling act which carries a continuous offer of corporate authority, legislate unto themselves power to legislate, then the charter was not amended in 1912; but, if they can legislate authority unto themselves without the aid of a law passed by the legislature or the people of the whole state, then the charter was legally amended and the port possesses authority to improve Oregon Slough.

If the reasoning employed and the conclusion reached in *State ex rel.* v. *Astoria,* 79 Or. 1 (154 Pac. 399), are to govern, then, that case is decisive here for it is there held that the legal voters of a port cannot on their own independent initiative amend their charter. While this appeal could, without further discussion, be determined upon the authority of the latest precedent, nevertheless, on account of the immediate as well as the future importance of the questions presented, they have been examined and considered anew.

This litigation arises out of the difficulty encountered in construing two amendments to the state Constitution which were adopted in 1906 and are designated as Article XI, Section 2, and Article IV, Section 1a. All that part of Article XI, Section 2, which is material here, reads thus:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

Preserving the punctuation found in the initiative petition filed with the Secretary of State, Article IV, Section 1a, is here set out in full:

"The referendum may be demanded by the people against one or more items, sections or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act. The filing of a referendum petition against one or more items, sections or parts of an act shall not delay the remainder of that act from becoming operative. The initiative and referendum powers reserved to the people by this Constitution, are hereby further reserved to the legal voters of every municipality and district, as to all local, special and municipal legislation, of every character, in or for their respective municipalities and districts. The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. Not more than 10 per cent of the legal voters may be required to order the referendum, nor more than 15 per cent to propose any measure, by the initiative, in any city or town."

The punctuation of the above section as it is printed in Lord's Oregon Laws is in some respects different from the punctuation found in the petition itself.

1. Each of the two sections is an initiated amendment and both were adopted by the people at the same election. These amendments were enacted by the people and for themselves; it is their Constitution; and, if possible their intent should be ascertained and given full effect, for the reason that the inquiry is not what the people can do but the inquiry is: What have they done? None of the language should be strained or distorted or given an unnatural meaning; but, every word, clause and sentence should be accorded whatever consistent meaning the context naturally suggests.

2. All the adjudications that have spoken on the subject have, without a dissenting voice, said that

these two amendments must be construed together for the reason that they were adopted by the electorate at the same time. The language employed by the two sections has provoked much debate and produced a variety of opinions concerning the true construction to be given the words found in the amendments. It is not easy and perhaps it is impossible to give a full and comprehensive meaning to every word in the amendments and at the same time avoid friction and bring about complete harmony between them. One section should not be so interpreted as to give some meaning to it and no meaning to the other or some part of it.

3. While we must endeavor to ascertain the intention of the people, as expressed in the Constitution, yet to the extent that attributes of sovereignty are granted to local subdivisions the language carrying the grant should be strictly construed for the reason that such grant is a limitation upon the power of the legislature (*Thurber* v. *McMinnville,* 63 Or. 410, 414 (128 Pac. 43); and the statement of this rule together with the contention made by plaintiff that the 1901 charter should be strictly construed, suggest the observation that to construe a Constitution, for the purpose of ascertaining whether under it a power can be or is granted, is not the same thing as construing a charter, when it is conceded that a power can be constitutionally conferred and the only inquiry is whether it has in fact been granted. Governed by these rules of construction, an attempt will be made to discover whether either or both amendments to the Constitution have conferred upon ports the right to amend their own charters.

4. Turning to the quotation from Article XI, Section 2, it will be observed that it contains three sentences.

The first sentence relates to the creation of corporations and it contains an express permission coupled with an express prohibition. The permission allows the legislature to pass general laws under which all kinds of corporations may be formed; and the prohibition prevents the legislature from creating any kind of a corporation by a special law. The second sentence only applies to a "municipality, city or town." The word "municipality" is either used in a broad sense or else it has a restricted meaning. If the term is comprehensive in its scope, it would include municipalities like ports; but, if the term is to be given a restricted meaning and is used as a synonym for city or town then it would signify a municipality in the nature of a city or town and would not include a port. However, regardless of the scope of the meaning of the word "municipality," the second sentence when speaking of a "municipality, city or town" contains either an express, absolute and unlimited prohibition as to those corporate bodies, or it contains an express but limited prohibition accompanied by an implied permission. If the prohibition is absolute then the legislature not only cannot pass a special law affecting a specific city or town but it cannot enact a general law applying to all municipalities or cities or towns. If, however, the prohibition is limited so as only to prevent the passage of special laws which enact, amend or repeal single charters or acts of incorporation then that limited prohibition necessarily implies a permission to enact general laws. No attempt is yet made to ascertain whether the prohibition contained in this sentence is unlimited or curtailed, for the inquiry still being pursued is whether the port can itself amend its charter. The third sentence contains an express permission and an implied prohibition:

The permission enables cities and towns to enact and amend their municipal charter and at the same time by its silence impliedly excludes every other kind of a corporation. The first sentence relates to the creation of corporations, while the second refers to what cannot be done after a municipality, city or town has been created and the third speaks of what can be done by a city or town after it has come into existence. No word or clause or sentence appearing in this section of the Constitution furnishes the slightest suggestion that any corporate body, other than a city or town, can amend its own charter or act of incorporation. The section may be scrutinized as a whole or dissected sentence by sentence, clause by clause and word by word, and the process may be aided by beguiling sophistry or cunning casuistry or compelling logic and yet it will be utterly impossible to extract a sustainable conclusion that a port can amend its own charter; and, therefore, if the Port of Portland has authority to legislate power to itself that authority must appear in Article IV, Section 1a.

Stated in broad terms the argument is that Article IV, Section 1a grants to every "municipality and district" the initiative and referendum powers "as to all local, special and municipal legislation;" that the disputed amendment of 1912 was municipal legislation; and that therefore the port was empowered to amend its charter.

Since Article IV, Section 1a, speaks of "the initiative and referendum powers reserved to the people by the Constitution" and as the powers referred to are preserved by Article IV, Section 1, it will be necessary to give some notice to the latter section before we can know what is further reserved by the former section. The constitutional amendment of 1902, known as

Article IV, Section 1, did not deprive the legislature of authority to enact laws but it expressly declares that ''the legislative authority of the state shall be vested in a legislative assembly'' with a limitation, however, which reserves to the people ''power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls an act of the legislative assembly.''

The initiative power defined in Article IV, Section 1 means the right of the legal voters of the state at large to initiate and enact laws or amendments to their Constitution. Before this amendment of 1902 the people had delegated their legislative authority to their representatives by a Constitution which declared that ''the legislative authority of the state shall be vested in the legislative assembly''; but, by reserving the initiative power the people returned to themselves the right, which they had in the very origin of state government, to legislate. In the beginning, the whole sum of legislative power came from all the people and when they reclaimed the right to legislate they only returned to themselves what they had previously delegated to their representatives and hence no charter is needed to measure the right of the people to legislate, for it is a right which is unfettered except as the people themselves have limited it. The legislative assembly is still retained, however, as the agent of the people and the principals have reserved unto themselves the right to ratify or reject measures passed by their representatives. When the people initiate and adopt a law they do so in the exercise of the initiative and when a measure which has been adopted by the legislature is referred to and acted upon by the people they

have made use of the referendum power. These are
the initiative and referendum powers which had been
"reserved to the people by the Constitution" and
which by Article IV, Section 1a, "are hereby further
reserved to the legal voters of every municipality and
district, as to all local, special and municipal legisla-
tion;" and it is therefore argued that the entire quan-
tity of power to enact "local, special and municipal
legislation" has been subtracted from the aggregate
of sovereign legislative authority and set adrift for
the use of any and every municipality.

Reasoning by analogy, it is contended that since the
total amount of legislative power has been given by
the Constitution itself to the people of the state at
large, therefore the whole sum of municipal legis-
lative power has likewise been given by the Constitu-
tion itself to the people of a municipality and to those
of a district, and that nothing more is required to aid
the grant made by the Constitution. This contention
is equivalent to saying that as to local, special and
municipal legislation a municipality or district is just
as supreme as are the legal voters of the state as to
state-wide legislation, and that therefore no charter
is required or, even if it is essential, the legal voters
can amend their own charter or act of incorporation
without first receiving permission from any other
legislative body.

It must be conceded that Article IV, Secton 1a, in-
cludes cities and towns as well as other municipalities
and that cities and towns derive just as much author-
ity from this section as any other municipality, and
that therefore if Section 1a dispenses with the need
of charters then a city or town can enact municipal
legislation to the fullest limit without a charter. This
section grants to a port no more power than it con-

fers upon a city but the latter is given just as much and in fact more power than the former. When we turn to Article XI, Section 2, however, we observe that a charter is necessary, and there cities and towns are granted the right to enact or amend their own charter. The grant of power to enact and amend their own charter is only one way of saying that a charter is requisite as a measure of corporate authority because otherwise it would have been enough merely to provide for the creation of a city or town. The very circumstance that provision is made for the amendment of a charter is a recognition of the necessity for the enlargement of a charter before an enlarged municipal power can be exercised. The same persons framed Article XI, Section 2, and Article IV, Section 1a, and they certainly did not intend to say in Article XI, Section 2, that a city must have a charter and in Article IV, Section 1a, that one was not needed. Both sections must be so read as to produce harmony. If Article IV, Section 1a, dispenses with charters then much of Article XI, Section 2, is deadwood; but, if the latter section is construed to mean what it says then a city or town must have a charter just as it was obliged to have one in the past, and the reason of the need for one is that it is an instrument containing the measure of exercisable power. The framers of this amendment recognized the continued need for a city charter. A city is a type of municipal government containing higher attributes of sovereignty than any other local subdivision and consequently the recognition of the necessity of a charter for a city carries with it a like recognition of the need of a charter or instrument of some kind by which to determine the extent to which a municipality or district proposes to enact local, special and municipal legislation. Every

municipality or corporate body must have a charter or grant of power. A municipality only exercises the power granted to it while the people of the state at large exercise all power except as curbed by limitations placed in the Constitution by themselves upon themselves. By the terms of Article XI, Section 2, a city must have a charter and it is inconceivable that Article IV, Section 1a, dispenses with the need of one. If by Article IV, Section 1a, a port needs none then by the same token a city needs none. A city can exercise only such powers as it has incorporated in its charter and a port is not more puissant. The very fact that Article XI, Section 2, provides for enacting or amending a charter after a city or town has been created is of itself only another way of saying that a charter enumerating the powers to be exercised is indispensable; otherwise, it would have been enough simply to provide a procedure by which a group of persons could transform themselves into a city or town and proceed to pass city ordinances. Why amend a charter if a charter is not essential? Somebody answers: Cities and towns have representative bodies called councils and a charter is necessary to limit the authority of those councils. The reply is that this identical Port of Portland at the very time of the adoption of the amendments to the Constitution also had a representative body made up of port commissioners who were and are the equivalent of city councilmen.

To amend a charter is one step and to exercise a charter power by transforming it into an ordinance is another step so that the process has required two steps. Why has the Constitution made provision for two steps if the first step was enough? There is nothing in these two amendments to the Constitution which

will serve as a foundation for the claim that it was intended to do away with charters; but, on the contrary every item of tangible evidence indicates that some law-making authority must take or grant a power before a municipality can exercise it. Had it been the intent to abolish charters Article XI, Section 2, would have contained appropriate or at least some language to indicate that intent instead of employing words which mean nothing unless they assume and imply and therefore signify the continued necessity of a charter which shall now serve the same purposes as before. If we are to preserve the presumption that all the words appearing in both sections were inserted for the purpose of conveying some meaning, then the conclusion is inevitable that Article IV, Section 1a, does not dispense with the necessity of a charter when Article XI, Section 2, recognizes it as a *sine qua non,* and that the former section does not grant the right to enact or amend a charter to every kind of a public corporation when the latter section in direct terms confers the right on cities and towns only, and by every known canon of judicial construction withholds the privilege from every other corporation. Surely, the persons who drafted these two sections of the Constitution did not contemplate that one would conflict with the other nor that one would nullify any portion of the other, especially when each was framed, submitted and adopted as a companion of the other. Both sections recognize the necessity of a charter as the measure of the legislative power to be exercised by corporations and both sections contemplate that no local subdivision of government except cities and towns can appropriate legislative power unto itself.

Proceeding with the contention it is insisted that, even though it be determined that a port must have

a charter, nevertheless, the legal voters of the Port of
Portland can amend their own charter and that this
power comes from Article IV, Section 1a. Again,
attention is directed to the fact that Article IV, Sec-
tion 1a, embraces cities and towns and every possible
power granted to any other corporate body is likewise
conferred upon every city and town; and, moreover,
this very section extends to cities and towns the right
to prescribe the manner in which they shall exercise
the initiative and referendum powers, a favor not ac-
corded to any other corporate body. If Article IV,
Section 1a, authorizes the legal voters of any kind of
a public corporation to enact or amend their own
charters, then most of the third sentence of Article XI,
Section 2, is a prodigal waste of words and is utterly
useless, for the reason that it would be a work of super-
erogation to say that the legal voters of cities and
towns can enact or amend their own charters if that
right had been conferred by the former section.
Moreover, when Article XI, Section 2, says that the
legal voters of cities and towns can enact or amend
their charters, it amounts to saying that no other sub-
division of government can enact or amend its charter
for the reason that the expression of one excludes all
the rest. If Article IV, Section 1a, grants to a port
the right to legislate unto itself a power to legislate
then that section of the Constitution conflicts with
Article XI, Section 2. It is unreasonable to suppose
that it was intended that one section would give to all
what another section only gives to some, or that one
would grant what another withholds for this would
result in conflict instead of harmony, and harmony is
the ''consummation devoutly to be wished.'' No sub-
division of government like a port or district can exer-
cise power unless that power is first granted by some

lawmakers authorized to legislate that power to the municipality or district. The Constitution enables the legal voters of cities and towns to enact or amend their charter, but does not permit the legal voters of any other municipality or district to enact or amend their charter or act of incorporation without outside legislative aid.

5. It is next claimed in behalf of the port that if its voters cannot amend their own charter then for all practical purposes the corporate body will be stunted and it cannot grow for the reason that the legislature is prohibited from amending the charter and it is not feasible to call upon all the voters of the state for an enlarged charter or act of incorporation. It must be conceded that it is not at all probable that either the framers of any part of the Constitution or the people of the state ever intended to confine the right of amending port charters exclusively to the voters of the state at large, and hence we now inquire whether the legislature is absolutely prohibited from passing either a general or a special law which amends or affects charters or acts of incorporation of ports.

If the legislature is prohibited from passing measures which may operate as amendments to charters the prohibition cannot be found in Article IV, Section 1a. Viewing this section by itself, not a word can be found which intimates that the legislature is powerless to pass measures affecting charters. It is true that Section 1a further reserves the initiative and referendum powers, and the powers referred to are the ones which had been previously reserved to the legal voters of the state. The powers reserved to the legal voters of the state do not abolish the legislature nor preclude it from enacting laws but on the contrary "the legislative authority of the state shall be vested in a legis-

lative assembly," although the people have reserved
the right to initiate their own laws or to refer meas-
ures passed by the legislature.   The word "referen-
dum" of itself implies the existence of a law-making
body other than the legal voters.   If it be contended
that Section 1a does not prevent the people of the state
at large from amending charters  but that it does pro-
hibit the legislative assembly, then the answer is: that
this section, standing alone, is equally devoid of pro-
hibition against the legislature as it is against the
voters of the state at large; and, therefore, if this sec-
tion confers municipal supremacy upon the munici-
pality itself  then that supremacy is as complete over
the voters of the state at large as it is over the legis-
lative assembly in which the legislative authority of
the state is vested.   However, no person has ever
argued  or even suggested  that the legal voters of the
state are prohibited by Section 1a from passing laws
amending municipal charters.   If Article IV, Section
1a, presents no obstacle to the voters of the state at
large  it offers no resistance to action by the legis-
lature; and, consequently, there is no impediment to
municipal law-making unless Article XI, Section 2, is
an obstacle.

The examination of  Article XI, Section 2, with a
view of ascertaining the extent of the prohibition im-
posed upon the legislative assembly carries us into a
field of contention and debate.   While the words found
in the amendment cannot be controlled by any extrane-
ous language, whether appearing in the ballot title
or in the argument which accompanied the tentative
draft, or elsewhere, nevertheless, it may be of some
interest first to give an account of the genesis of the
amendment  and possibly this recital together with the
words of the ballot title will throw some light upon the

doubtful language which has produced so much controversy about the construction to be placed upon Article XI, Section 2.

On September 6, 1906, a circular letter accompanied by a tentative draft of a proposed amendment to Article XI, Section 2, and a like draft of what is now Article IV, Section 1a, was mailed "to more than a thousand representative citizens of Oregon to get their opinion on the wisdom of trying to submit the inclosed suggested constitutional amendments." The letter avowed that it was the purpose of the signers to "try to form an organization of four hundred or five hundred citizens to present such of these measures as may be agreed upon" and closed with a request for a reply to W. S. U'Ren. The names of 17 persons with that of Thomas A. McBride, who is now the Chief Justice of this court, heading the list, appear as the signers and authors of the letter. Subsequently the persons who were promoting the proposed constitutional amendments formed an organization known as the People's Power League of Oregon with four officers and an executive committee of 21 persons including Thomas A. McBride.

The tentative draft of the proposed amendment to Article XI, Section 2, was substantially the same and almost identical in terms with Senate Joint Resolution No. 3, which was adopted by the legislative assembly in 1901 and again in 1903 (Laws 1901, p. 471; Laws 1903, p. 346); and accompanying that tentative draft was an argument which is here quoted for the reason that it fully explains the real purpose of the amendment:

"The usual method of making city charters in the past has been, in this state, for a few men to agree on the charter they wanted for the city. Then it was introduced in the legislative assembly by one of their

county members. It was referred to a committee consisting of the members from his county, reported favorably, of course, and enacted by unanimous consent of the legislature. No other member ever sees or cares anything about it. The only exception in Oregon to this method is the charter under which Portland is governed, and which seems to be the most satisfactory the city ever had. This was drafted by a committee of citizens and approved by the people at an election, after which it was enacted by the legislature. But the action of the legislature is a needless formality. Of what interest are the local laws of Portland to farmers of Klamath County, or the charter or ordinances of Lakeview to the fishermen of the Columbia River? This amendment is another step towards home rule in home affairs. If it is enacted it will not only relieve the legislature of a great deal of useless labor, but it will place the power to make the city laws in the hands of the people who have to obey them.''

An examination of the public prints issued at that time discloses that the idea which was uppermost in the minds of all was to take from the legislature the power to make *a* charter for *a* city or town by a *special* law. The evil sought to be removed was the making of a single charter for a single city by a few men who agreed ''on the charter they wanted for the city.'' The suggestion was nowhere made that evils were necessarily involved in the enactment of general laws which affected all the cities and towns alike. Indeed, comparatively few general municipal laws had been passed; and it is a noteworthy fact that most of the general municipal legislation was admittedly meritorious, for example, the Bancroft bonding act. While the farmers of Klamath County might not be interested in a law which applied only to Portland and the Columbia River fishermen might not be concerned in the charter or ordinances of Lakeview, yet, both the

82 Or.—36

Klamath County farmers and the Columbia River fishermen might be vitally interested in a general law which expressed a state-wide policy concerning municipalities, and that interest might be just as vital as their interest in a law affecting all road districts, or all school districts or all counties.

The tentative draft of Article IV, Section 1a, was also accompanied by an argument which is devoted mainly to a consideration of the referendum against single items and sections of appropriation bills and concludes with a single sentence that is applicable to the desirability of referring municipal legislation and reads thus:

"The adoption of this amendment will give the people power to control salaries of county and district officers."

After making changes, the tentative drafts finally crystallized into forms which were satisfactory to the People's Power League of Oregon and that organization then caused initiative petitions to be circulated and, on February 3, 1906, completed initiative petitions were filed in the office of the Secretary of State requiring that both proposed measures be placed upon the ballots to be cast at the ensuing general election. At the time of the submission of the proposed amendments it was not the specific duty of the Attorney General, as it is now, to prepare the ballot titles for initiated or referred measures, and consequently the ballot title for Article XI, Section 2, was prepared by a quorum of the executive committee of the People's Power League of Oregon and filed with the Secretary of State who caused the ballot title to be printed, as it was submitted to him, thus: "Constitutional amendment giving cities and towns exclusive power to enact and amend their charters."

Having given an account of the origin and evolution of the amendment, we are enabled to attempt to ascertain the construction to be placed upon Article XI, Section 2. It will be recalled that it was suggested that the word "municipality" employed in the second sentence is used either in a comprehensive or else in a restricted sense. If it is to be given its broadest signification it will include a port; but, if it is narrowed it only means a municipality like a city or town and in that event the prohibition in the second sentence would only prevent the legislative assembly from enacting, amending or repealing any charter or act of incorporation for any city or town or municipality in the nature of a city or town. The ballot title offers the suggestion that the word "municipality" was used merely as a synonym for "city or town", for the ballot title uses the words "cities and towns" and nowhere employs the word "municipality"; and, moreover, this suggestion finds some corroboration in the circumstance that only cities and towns are mentioned in the third sentence. If it was intended to lay a prohibition on the legislature as to cities and towns and also on another sort of "municipality" why did not the next sentence, which grants a permission, include that other kind of a "municipality" in the permission? If the word "municipality" as here used includes a port it also includes a county because Article XI, Section 9, speaks of "county, city, town or other municipal corporation." If a port and county are not included within the prohibition of the second sentence then the legislature can pass a special law amending a port charter or affecting a single county; but if a county and a port are within the embrace of that sentence, then the legislature cannot single out a county and pass a law which is special

as to such county, and the result will be that, by an actual count, 125 statutes passed by the legislature since 1906 are indubitably void, 34 more are probably void and about 25 others are possibly void. Considered as an *ad hominem* argument the probable consequences of a different interpretation are sufficient to justify a resolving of a doubt in favor of a construction which holds that the word "municipality" is only used in the second sentence of Article XI, Section 2, as a synonym for city or town. However, it is not necessary to rest this conclusion upon the doctrine of consequences for the reason that every sign found in the amendment itself, as well as all the evidence afforded by the argument made by its framers and the ballot title prepared by them, points with unerring certainty to the conclusion that cities and towns were municipalities which were uppermost in the minds of those who framed this amendment and the word "municipality" was only used as a synonym for city or town. This construction does not place ports and counties and similar municipalities in a position where the legislature can exercise an arbitrary authority over them. The second sentence does not prohibit the legislature from passing a law applying only to one port for the reason that a port is not within the prohibition of the second sentence of Article XI, Section 2; such statute when passed is a grant of power and becomes available to the port; the enactment is municipal because it appertains to a municipality, and it is also local and special, for the reason that other ports are not included; and the measure being municipal and also local and special the people of the port can refer that special, local and municipal legislation to themselves and approve or reject the measure.

This construction recognizes that legislative authority is vested in the legislative assembly as declared by the Constitution and at the same time it executes the natural meaning conveyed by the language found in Article IV, Section 1a, where it is said that the referendum power is reserved "as to all local, special and municipal legislation," and responds to the argument advanced by the framers of Section 1a which is again quoted:

"The adoption of this amendment will give the people power to control salaries of county and district officers."

Assuming, however, that the word "municipality" is used in its comprehensive sense and embraces a port, we are at once carried into the still controverted question of whether the legislature is prohibited from enacting a general law affecting municipalities. If the words found in the ballot title are divorced from all other considerations, whether essential and omnipresent or immaterial and transient, then some evidence is found to support the contention that the prohibition precludes the passage of a general as well as a special law, for the language of the ballot title prepared by the executive committee of the People's Power League of Oregon is: "Constitutional amendment giving cities and towns exclusive power to enact and amend their charters." Even though it be conceded that any weight can be attached to the wording of the ballot title, nevertheless, it must be considered in connection with the amendment itself; and although the word "exclusive" is employed, yet, no person contends that the power to amend charters has been lodged with those municipalities to the exclusion of every other law-making authority. It could not literally be true that a city has exclusive power to enact and

amend its charter if the power to do the same thing also resides elsewhere. That the legal voters of the state at large can adopt either a special or a general law, enacting or amending or even repealing city and other municipal charters and acts of incorporation, is acknowledged by all persons. No one has undertaken to argue that all the people cannot pass a general or a special law affecting charters; and, therefore, if the power to enact or amend municipal charters is granted to voters of the municipality and at the same time the same identical power is exercisable by the legal voters of the state at large, it necessarily follows that the power of the city or town is not exclusive.

The fact that the right of the legal voters of cities and towns to enact or amend their charters is "subject to the Constitution and criminal laws of the State of Oregon," involves the suggested implication that the right is not subject to any laws except criminal laws and this is a strong circumstance in support of the theory that the legislature cannot enact a general law affecting the charter or act of incorporation for any municipality, city or town.

The word "any" has played an important role in some of the prior discussions, the argument being that the term "any" means "all" and is equivalent to saying that the legislature must keep its hands off every charter and every act of incorporation of every municipality, city and town. Omitting the word "any" there is not even one word indicating the plural number in the second sentence of Article XI, Section 2. The sentence is not "any and every charter"; it is not: "any charters"; it is not: "any or every charter"; nor is it: "any or all charters." Omitting the word "any", every word is used in the singular number and unless the word "any" gives a

plural meaning to words which otherwise would mean
singleness, then this second sentence does not prohibit
the legislature from passing a general law amending
the charters or acts of incorporation of ports, or even
cities and towns.   It is true that the word "any" may
sometimes signify every or all, because like all other
general words  it is ofttimes limited by the context or
subject matter.   Primarily "any" means: "One indif-
ferently out of a number."   Webster's Dictionary.
See  also  Soule's  English  Synonyms.  "*Any*," is a
derivative of "*one*," "or rather of its weakened form
'*an*,' '*a*,' in an indeterminate unitary or, in plural,
partitive use. * * In the singular, one, a or an, some;
in the plural, some; indeterminately distributed, im-
plying unlimited choice as to the particular unit,"—
and signifies "an indeterminate unit or number of
units out of many or all."   Century Dictionary.   Ap-
plying the word in its etymological sense  the second
sentence is only one way of saying that the legislature
cannot select one city or town and pass a law enacting
or amending or repealing *the* charter of that one city
or town; nor can the legislature select *some* cities or
towns and pass a law which enacts, amends  or repeals
*the* charters of only *those* cities or towns.   A multi-
tude of judicial precedents give support to the inter-
pretation now placed upon the word "any".   3 C. J.
231.

Reverting to the evil which the amendment was de-
signed to remove, it will be recalled that the objection
voiced by the argument, which the framers of this
amendment submitted with the  tentative  draft,  was
that city and town charters were being passed by the
legislature for single cities and towns under circum-
stances which in the final analysis made the charter
ostensibly the legislative act of all  but really the legis-

lative act of only two or merely a few members of the
legislature. The theme for all the pamphlets and
newspaper editorials discussing Article XI, Section 2,
was the desirability of preventing the legislature from
passing *a* charter for *a* city when none of the legis-
lators, except those from the county in which the city
was located, knew or even cared anything about the
charter either before or after its passage. Neither
the evil nor the objection included general laws apper-
taining to all cities and towns. The grievance was
centered upon and confined to special acts passed for
single cities. The idea which was uppermost in the
minds of all persons was to prevent the legislature
from enacting or amending a charter for a specified
city; and the constant presence of this idea dominated
the language employed by the framers of the amend-
ment and it was only natural for them to express this
dominating idea by using the word "exclusive" in the
ballot title and the term "any" in the body of the
amendment; and, therefore, the words signify that as
between the legislature and the legal voters of *a* city,
the latter are given the exclusive right to enact or
amend *a* charter for their individual city. It is ad-
mitted on all hands that the ballot title is not literally
correct for the reason that all persons concede that
the voters of the state at large can enact or amend
or repeal a single charter. The word "exclusive"
may, however, be presumed to have been used to ex-
press some idea of exclusiveness, and the idea intended
to be expressed was plainly the one which was upper-
most in the minds of those who wrote the ballot title:
a purpose to empower the people of a city or town to
enact or amend their charter and to exclude the right
of the legislature to affect *that* charter by a special
law. The legislature has the right to pass a general

law concerning municipalities, cities and towns; the right is contained in the Constitution; and therefore when the legal voters of a city or town enact or amend a charter they do so subject to the right of the legislature to pass a general law because their right to enact or amend their charter must be exercised "subject to the Constitution."

The interpretation which gives to the word "any" the meaning of *oneness* as distinguished from *allness* is further supported and strengthened by the language used in the companion amendment, Article IV, Section 1a. Before noticing the twin section more minutely, let us remind ourselves that it is fair to assume that Section 1a was drawn with reference to the variant internal governmental organisms found in the different forms of municipalities and districts. A city or town had within itself its own representative body exercising law-making powers; some other forms of local government, for example ports, possessed an analogous internal legislative body; and while the remaining municipalities and districts had their representatives yet those representatives were only empowered to transact business and had no authority to make municipal laws. Again quoting from Article IV, Section 1a, it will be observed that the initiative and referendum powers are further reserved to the legal voters of every municipality and district "as to all local, special *and* municipal legislation, of every character, *in* or *for* their *respective* municipalities and districts." At this point we direct attention to the fact that the initiative petition filed with the Secretary of State does not have a comma after the word "special" and consequently it was erroneous to insert a comma after the word "special" when Article IV, Section 1a, was carried into Lord's Oregon

Laws. It was appropriate to use the word *"in"* in order to embrace legislation by internal law-making bodies. Moreover, the language is not "in *and* for" but it is "in or for." The word "for" was an appropriate term to indicate legislation by a law-making body existing outside the municipality. There were only two methods by which legislation could be enacted outside the municipality: (1) The people of the state at large; and (2) the legislative assembly. The term "referendum" necessarily assumes the existence of a law-making body other than the voters themselves; and, hence when a municipal law is *enacted in* the municipality it can be referred, and when a municipal law is enacted by the legislative assembly *for* one municipality like a county or port, it can likewise be referred. Again noticing the wording of Section 1a, it will be seen that the language is "local, special *and* municipal legislation" and not "local, or special or municipal legislation." When a city council or other internal representative body of a municipality enacts a law or when the legal voters of a city pass a measure, it is necessarily local and special to itself and is municipal in quality, because such a law-making body could not enact any other character of legislation. So too, when the legislature enacts a law for only one municipality, that law is special and local because in direct terms it is applicable only to a specified municipality and is of course municipal in character because appertaining to a municipality. Granting the right to exercise the initiative and referendum as to "all local, special and municipal legislation" is equivalent to saying that those powers cannot be applied to legislation which is not "local, special and municipal." It is not enough that the legislation be municipal in character but it must also be local and special; and

therefore the very language of Section 1a contemplates not only that the legislature can enact municipal legislation but also that the legal voters of one municipality cannot invoke the referendum to determine whether they shall be governed by a general law which has been passed for all municipalities.

This result does not emasculate the power of cities and towns to enact or amend their own charters. Take for example the Bancroft bonding act and assume that it had been passed by the legislature to-day: It would apply to all the cities and towns in the state and would be available to all the people of the respective cities and towns. To-morrow, however, the city could legislate concurrently upon the same subject and make use of its legislation if the city legislation did not conflict with the state legislation. If the legislature passes a general municipal measure it can be referred to the voters of the entire state the same as any other general legislation, but it is safe to say that in the practical administration of affairs legislators will be extremely tender of the rights and the wishes of cities and towns. The legislature cannot pass a special law for a city or town; but it can enact local, special and municipal legislation for any other kind of a municipality or district subject, however, to the right of the legal voters of such municipality or district to refer the measure to themselves for their approval or disapproval. A painstaking investigation by every member of the court confirms our belief in the correctness of the conclusion that the legislature can enact general laws concerning cities and towns and other municipalities. A construction of the Constitution which enables the legislature to pass a general law relating to cities and towns harmonizes the different sections and makes the organic law consis-

tent with itself. To hold that the legislature cannot pass a general law affecting municipalities will not only jeopardize all bonds that may have been issued pursuant to Chapter 128, Laws of 1907 (codified in Sections 3254 to 3263, inclusive), but improvement bonds issued by cities and towns since 1907 under the provisions of the Bancroft bonding act may be rendered doubtful to whatever extent they may be dependent for their legality upon the validity of the amendment enacted by the legislative assembly in 1907 (Chapter 201, Laws 1907); and let it be remembered that since 1907 the City of Portland alone has issued bonds under the Bancroft bonding act amounting to approximately $4,000,000.

Speaking for himself the writer says that: had any doubt remained after an extended examination of the subject it would be clarified and entirely removed by the declaration of Mr. Chief Justice McBride who says that the sponsors for the amendments neither intended nor thought nor even dreamed that the amendments would prohibit the legislature from enacting general laws relating to municipalities, cities and towns. He assisted in launching the movement to amend the Constitution; his guidance was sought and his counsel was followed by his coadjutors; he knew the object designed to be accomplished; and no living person more than he is in a position to speak understandingly of the intention sought to be expressed by the language employed, for the reason that he helped to frame both amendments. "He who made the law knows best how it ought to be interpreted" is not less true now than it was when Rousseau wrote.

Summarizing the foregoing discussion: The legislative assembly cannot *create* any corporation by a special law; but corporations of all kinds may be

formed under appropriate general laws passed by the legislative assembly. Charters or laws granting or enumerating the powers exercisable by a corporation are indispensable. Cities and towns can enact or amend their own charters, but no other corporate body can, without an enabling act, legislate power unto itself to legislate. The legislative assembly cannot enact a special measure which enacts, amends or repeals a specified city or town charter, but it can enact a special law which amends the charter or act of incorporation of a municipality, other than a city or town. The legislative assembly can enact a general law affecting the charters or acts of incorporation of all cities or towns, or municipalities or districts. If a municipality has within itself a representative lawmaking body then the legal voters of such municipality can apply the referendum to any measure passed by that representative body; if the legislative assembly passes a special measure for a specified municipality or district, other than a city or town, then the legal voters of that municipality can apply the referendum to that special measure for the reason that this gives practical application to Article IV, Section 1a, which reserves the referendum "as to all local, special and municipal legislation of every character *in* or *for* their *respective* municipalities," and also carries into execution the purpose expressed in the argument submitted by the framers of the amendment to the Constitution. The people of the state at large can apply the referendum to all general municipal legislation but the legal voters of an individual municipality cannot refer to themselves, as distinguished from the voters of the state at large, any general municipal measure passed by the legislative assembly.

The construction adopted here removes friction between the two amendments, promotes harmony between them, makes them consistent with each other and with themselves and with the Constitution as a whole, and above all carries out and preserves the idea of home rule without at the same time creating an *imperium in imperio* or denying the power of legislation to the sovereign people of the state at large or their agent and representative, the legislative assembly where, in the words of the Constitution itself, "the legislative authority of the state shall be vested." The amendments were innovations at the time of their adoption and their newness made it difficult to understand their full scope and meaning; what was then theory has since become practice, and what to some may once have appeared apocryphal has now become familiar and accepted usage, so that now the language of the amendments is shown in the clearer light of practical experience, rendering it less difficult to interpret the amendments and enabling all readers to see plainly what was then clear to the writers of these changes in the Constitution.

6, 7. The doctrine taught by *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145), was overruled by *State ex rel.* v. *Port of Astoria,* 79 Or. 1 (154 Pac. 399), and counsel have expressed some apprehension lest the Port of Portland is now prohibited from continuing in the pilotage and towage business. We merely call attention first to 23 Cyc. 1269 where it is stated that:

"A judgment for or against a municipal corporation, in a suit concerning a matter which is of general interest to all the citizens or taxpayers thereof, as the levy and collection of taxes, or public contracts or other obligations, or public property, its title, character or boundaries, is binding, not only on the municipality and its officers, but also upon such citizens or

taxpayers, in so far as concerns their rights or interests as members of the general public, although not in respect to rights which they hold as individuals, peculiar to themselves and not shared with the public. And subject to similar limitations, a judgment between certain residents or taxpayers and the municipality may be conclusive on all other citizens similarly situated.''

And then we point to 23 Cyc. 1221, where we read that:

''The decision of an appellate court is binding and conclusive upon the parties, as to the matter or point adjudged, in subsequent litigation between them in the same or any other court, and this is true even though the appellate court has since decided differently in other cases.''

The interveners contend that when they made their investments they did so relying on the power of the legal voters to amend their own charter as ruled in *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145). No court ruled that the port must dredge Oregon Slough or that the interveners could themselves compel the improvement. The right to do and the right to compel to do are not identical. If, after some court has held that a city can improve streets, a person buys a city lot relying on the city to pave the street in front of his property that court decision plus the purchase of the lot do not enable the property owner to compel the city to lay pavement on the street in front of his lot.

All the parties to this suit agree that it is essential to the development and welfare of the Port of Portland that it be granted power to improve Oregon Slough. The legislative assembly is now in session and has ample authority to grant the desired power to the Port of Portland.

The decree of the Circuit Court is reversed and the cause is remanded for such further proceedings as are not inconsistent with this opinion.

REVERSED AND REMANDED.