Argued April 27, demurrer and motion for judgment on the pleadings overruled June 8, 1921, dismissed on motion of the plaintiff November 7, 1923.

## J. M. DOUGAN *v.* VAN RIPER, KLAMATH COUNTY TREASURER, ET AL.

(198 Pac. 897.)

**Pleading—Portions of Answer in Part Material and in Part Immaterial Secure from Motion to Strike.**

1. Portions of an answer to a petition for *mandamus* which are either entirely material or in part material and in part immaterial are secure from attack made by motion to strike.

**Counties—County Which had Exceeded Debt Limit Could not Contract for Courthouse to be Paid for Out of General Fund.**

2. A county in debt in an amount exceeding the constitutional limit could not contract for construction of a courthouse to be paid for out of its general fund, and could legally contract only for the building of a courthouse to be paid for out of special funds.

**Counties—Special Levies Made for Courthouse on One Block not Available to Contractor for Courthouse on Other Block.**

3. Special levies by a county for certain years, made expressly for a courthouse on one block, cannot be availed of by a contractor to construct another courthouse on another block as a special fund available for payment of his warrants, though all taxes collected for courthouse construction, including both, were commingled in one fund.

Counties—Courthouse Contractor Entitled to Look to Special Fund as It Legally is.

4. A contractor with a county to construct a courthouse is entitled to look to the special courthouse fund as it was and legally is, and is not bound by what might have but was not done in respect of such fund.

Mandamus—Allegations of Answer to Courthouse Contractor's Petition for Mandamus Relative to Levy for Other Courthouse Immaterial to Issues.

5. In *mandamus* proceedings by contractors with a county to construct a courthouse to compel the treasurer to pay a money decree previously obtained against the county on account of an unpaid warrant given the contractors, allegations in the answer as to the proposed levy for another new courthouse, begun, but not finished, were foreign to the issues.

Statutes—Phrase must be Read in Light of Origin and History of Statute.

6. A phrase used in a statute must be read in the light of the origin and history of the statute.

Taxation—Statute Authorizing Reception of County Orders in Payment of "County Taxes" Excluded State Taxes.

7. When Section 3406, Or. L., providing county orders payable out of county revenue shall be received in payment of county taxes, etc., was originally enacted, the words "county taxes" were used to exclude at least state taxes and possibly other taxes.

Taxation—Statute Authorizing Reception of County Orders in Payment of Taxes Receives Strict Construction.

8. A rule of strict construction is applied to statutes like Section 3406, Or. L., providing that county orders payable out of county revenue shall be received in payment of county taxes without regard to priority of presentment, number, etc.

Counties—Reception of County Warrants on Other Funds in Payment of Special Courthouse Taxes Equivalent to Borrowing from Courthouse Fund.

9. However Section 3406, Or. L., providing county orders payable out of county revenue shall be received in payment of county taxes, etc., may be construed, whenever a county warrant drawn on some other fund was presented and received in payment of special courthouse taxes, it was in the final analysis equivalent to borrowing from the courthouse fund moneys with which to pay the debt of the other fund, and the courthouse contractor, as creditor of the special courthouse fund, is entitled to have restored to such fund cash in an amount equal to the amount of warrants on other funds received in payment of special courthouse taxes since the date to which the contract for the courthouse referred.

Judgment—Taxpayers and Sheriff Need not Pay in Cash Courthouse Taxes Paid by Surrender and Cancellation of County Warrants Pursuant to Judgment.

10. Where, pursuant to judgment against him in a taxpayer's action, the sheriff of a county received in payment of special

courthouse taxes certain county warrants and turned them over to the county treasurer and was given credit therefor, while the warrants were canceled and retired, the taxpayer, at instance of the contractor for a new courthouse, need not again pay such taxes, and the sheriff need not pay, whether or not reception of the warrants in payment of taxes was proper.

**Counties—Restoration of Depleted Special Courthouse Fund cannot be Made by Taking Moneys from Nondebtor Special Fund.**

11. Restoration to a special courthouse fund depleted by the reception of county orders in payment of special courthouse taxes cannot be made by taking moneys from a nondebtor special fund, warrants of which have not been received in payment of the courthouse taxes.

**Taxation—Courthouse Contractor's Claim Against County Subordinate to That of State for Taxes.**

12. If there are not enough moneys in the hands of a county treasurer to pay both state taxes and a contractor with the county to build a courthouse, the contractor's claim must be subordinated to that of the state.

Original proceedings in *mandamus.*

This is a proceeding commenced in this court by J. M. Dougan and R. E. Chrisman, partners doing business as J. M. Dougan Company and J. M. Dougan, for the purpose of compelling, by means of a writ of *mandamus,* Klamath County to pay a money decree previously obtained by the plaintiffs against the county.

On March 20, 1918, the plaintiffs, whom we shall hereinafter designate as Dougan, entered into a contract with Klamath County for the construction of a courthouse on block 35 for $131,775. At some time after June 30, 1911, the county began the construction of a courthouse on block 10 in Hot Springs Addition. A large sum of money, about $145,915.12, was expended on the courthouse begun on lot 10. However, work ceased on that building in about the latter part of 1914 and it has not yet been completed. A recall election held on April 22, 1918, resulted in the recall of the county judge who with one of the county commissioners had signed the con-

tract with Dougan. Immediately after the execu-
tion of the contract with the county, Dougan com-
menced the work of constructing the courthouse on
block 35; and on April 17th and April 18, 1918,
Dougan was paid $41,548 on his contract. Dougan
completed the courthouse, and on February 27, 1919
the superintending architect issued a certificate
showing that Dougan was entitled to receive the
balance due on the contract as well as payment for
extras, amounting in the aggregate, for the extras
and the balance due on the original price, to
$92,674.95. Upon the refusal of the county to pay,
Dougan brought a suit against Klamath County,
the county judge and the two county commissioners,
the county clerk, the county treasurer, John Koontz,
Frank Ward, Charles Loomis, Marion Hanks, Frank
H. McCornack and E. E. McClaren; and in that
suit Dougan prayed for a decree requiring the
county. to accept the courthouse constructed by
Dougan and, out of the special courthouse fund, to
pay Dougan's claim for $92,674.95. That suit in
equity, after a trial in the Circuit Court, was ap-
pealed to this court, and it was decided here on
November 30, 1920, in an opinion written by Mr.
Justice JOHNS: *J. M. Dougan Co.* v. *Klamath
County,* 99 Or. 436 (193 Pac. 645). This court
ruled that Dougan was entitled to recover from the
county the sum of $92,674.95, the full amount of his
claim, together with costs and disbursements which
were taxed at $1,093. A mandate was issued from
this court on March 5, 1921, and on March 7, 1921,
the Circuit Court for Klamath County entered a
decree pursuant to the mandate.

In the alternative writ of *mandamus* in the instant
proceeding it is stated that on March 23, 1921,

Dougan duly satisfied the money decree of record in conformity with Section 361, Or. L., and that Dougan received from the county clerk one warrant for $1,093 drawn on the county's general fund and three warrants drawn on the special courthouse fund for the following several amounts: $65,000; $7,102.48; and $20,572.47. On the same day, March 23, 1921, Dougan presented the warrants to G. K. Van Riper the county treasurer for payment. The county treasurer paid the warrant for $65,000 and the one for $7,102.48, making an aggregate payment of $72,102.48. The county treasurer represented to Dougan that $72,102.48 was all the cash on hand in the special courthouse fund under his control, and that for that reason he could not pay the warrant for $20,572.47 drawn on the special courthouse fund. The treasurer also refused to pay the warrant for $1,093 drawn on the general fund, claiming that he had no money in his hands which could be legally used in payment of this warrant.

After the refusal of the county treasurer to pay the two warrants mentioned, Dougan filed in this court a petition for a writ of *mandamus,* and based on the petition an alternative writ was issued out of this court under date of April 5, 1921. The defendants filed an amended answer. Dougan has filed not only a motion to strike out certain portions of the amended answer but also a demurrer to the second, third and fourth separate defenses pleaded in the amended answer. Dougan has also filed a motion for a judgment on the pleadings.·

DEMURRER AND MOTIONS OVERRULED.  DISMISSED.

For plaintiffs there were oral arguments by *Mr. Harrison Allen* and *Mr. A. E. Reames.*

For defendants there was a brief over the name of *Mr. Fred H. Mills,* with an oral argument by *Mr. Jay Bowerman.*

HARRIS, J.—1. The motion to strike assails twelve several portions of the amended answer. Although within some of these several twelve portions are lesser parts which might be properly stricken from the pleading, in each instance the lesser part is accompanied by and connected with other matter properly and rightfully pleaded. In other words, the twelve portions, are either entirely material and therefore· rightfully pleaded or in part material and in part immaterial and, therefore, secure from the attack made by the motion, because to allow the motion in any one of the twelve instances would be to strike out material matter. A detailed discussion of each of the items enumerated in the motion to strike would unduly extend this opinion; and hence we will not discuss the motion to strike further than to declare that, for the reason already expressed, it is overruled.

In the instant proceeding Dougan is asserting and the defendants are denying that the county treasurer has in his hands funds available for the payment of the two unpaid warrants held by Dougan; and consequently a clearer understanding of the pleadings may be had if we first give an account of the various levies made for courthouse construction. In the years 1909, 1910 and 1912, special levies were made for courthouse construction; but these levies were not limited to any particular site. Special levies for courthouse construction were made in 1913 and 1914; but each of these two levies was made expressly for use on the build-

ing which was in course of construction on block 10 in Hot Springs Addition. In 1915, 1916 and 1917 special levies were made for courthouse construction without making express reference to any particular site. In 1918 a special levy was made for the express purpose of completing the courthouse on block 10 in Hot Springs Addition.

2. Klamath County was in debt in an amount exceeding the constitutional limit; and therefore as stated by Mr. Justice JOHNS in the opinion in the main case the county could not contract for the construction of a courthouse to be paid for out of its general fund and could legally contract only for the building of a courthouse to be paid for out of special funds. It was decided in the main case that the County Court had lawful authority to make the Dougan contract and that the contract was therefore legal; and that determination is now a finality. It was determined in the main case that the contract was made with reference to the special courthouse fund and that both parties contemplated and understood that the contract price should be paid out of that special fund and that it could not be paid out of the general fund; and that determination is likewise a finality. Before deciding the main case an attempt was made by this court to ascertain from the record the exact amount of money which on March 20, 1918, had been collected and properly belonged at that time to the special courthouse fund. The purpose of the attempt was to settle the controversy as to the amount of money which belonged to and should be in the special courthouse fund; but we found it impossible to calculate from the data found in the record in the main case the amount of money which then properly belonged

to the special courthouse fund. In the opinion rendered in the main case it was said in substance that the Dougan contract was made with reference to the special courthouse fund as it existed and was in course of collection on March 20, 1918, and that the whole amount of the special courthouse fund, as defined in the opinion, should be applied upon the payment and *pro tanto* satisfaction of Dougan's claim. In the instant proceeding the parties do not agree in their interpretation of the language used in the opinion in the main case concerning the amount of the special courthouse fund. We did not intend to decide or even intimate that the amount of the courthouse fund available to Dougan was greater or less than the amount of the Dougan claim; for as already explained we were without sufficient data to calculate the amount of money properly belonging to the special courthouse fund. Nor did we intend to decide that the Dougan contract was made with reference to the seeming condition of the special courthouse fund on March 20, 1918, and not to the condition in which it ought to have been. It was of course decided that Dougan could look only to the special courthouse fund for payment; but, because the data appearing in the record was insufficient, it was our purpose to leave undecided the question as to the amount of money then belonging to the special courthouse fund. We did not intend to say that Dougan was obliged to look to the special courthouse fund as it actually existed on March 20, 1918, regardless of whether or not moneys had been previously diverted from that fund or charges had been improperly made against it. Dougan contends that the opinion in the main case decides not only that a fund existed but

also that there was in such existing fund a sum
sufficient to meet the obligation of the contract. As
previously explained we did not determine the
amount of money in the fund. The defendants
contend that when we stated that the Dougan con-
tract was made with reference to the special court-
house fund as it was on March 20, 1918, we ruled
that inquiry concerning collections must begin with
and cannot go back of March 20, 1918. A large
amount of county warrants were received prior to
March 20, 1918, in payment of taxes levied for court-
house construction. We did not intend to decide
that Dougan could not inquire into such payments
so made prior to the date of the contract. When
deciding the main case we intended to leave at
large the question of the amount of the special
courthouse fund; and hence the contentions made
by the litigants in respect of the effect of the main
case cannot be sustained.

3. At this point in the discussion we should re-
mind ourselves that in the opinion rendered in the
main case we ruled that not all the special levies
made for courthouse construction are available to
Dougan. The special levies for the years 1913,
1914 and 1918 were made expressly for the build-
ing on block 10; and, hence, none of the moneys de-
rived from these three levies are, as the situation
now is, available to Dougan. Nearly all of the
moneys collected upon the levies of 1909, 1910 and
1912 were used in payment of work done on the Hot
Springs courthouse. However, it appears from the
amended answer that a portion of the 1909, 1910
and 1912 levies became delinquent and that during
and between the years 1916 and 1919 comparatively
small amounts were collected on the levies of 1909,

1910 and 1912. It also appears from the answer that during and between the years 1916 and 1919 taxes were collected on the levies of 1913 and 1914. It further appears that all taxes collected for courthouse construction were placed in one fund which is known as the special courthouse fund; and consequently taxes collected on the levies of 1913, 1914 and 1918 were commingled with the taxes collected on the levies of 1909, 1910, 1912, 1915, 1916 and 1917. Although on March 20, 1918, the special courthouse fund contained all unexpended taxes which had been collected for courthouse construction, Dougan was not entitled to look to the levies of 1913 and 1914 for payment. Nor is Dougan now entitled to look to the 1913 levy for payment of his warrants. In short, whatever moneys remained in the special courthouse fund on March 20, 1918, from the levies of 1909, 1910 and 1912 were available to Dougan; but any moneys derived from the levies of 1913 and 1914, although in the courthouse fund on March 20, 1918, and at that time commingled with the moneys raised from levies made prior to 1913 and with moneys derived from levies made subsequent to 1914, were not available to Dougan; nor are the taxes derived from the 1918 levy available to Dougan. In the final analysis Dougan can look only to moneys derived from the levies of 1909, 1910, 1912, 1915, 1916 and 1917. Since practically all of the taxes specially levied in 1909 and 1910 and 1912 were not only collected but also expended prior to the date of the execution of the Dougan contract and a comparatively inconsiderable portion of these levies was collected and was in the special courthouse fund on March 20, 1918, the levies of

1915, 1916 and 1917 naturally become the main subjects of this controversy.

It is averred in the writ that on March 20, 1918, after first deducting the disbursements previously made from the special courthouse fund, the sum of $133,241.97 remained in the treasury from the levies of 1915, 1916 and 1917. This averment is denied by the defendants who say that the amount, including cash and taxes in course of collection, did not exceed $124,755.46.

Dougan alleges that although the levies of 1915, 1916 and 1917 produced a fund which had in it or should have had in it on March 20, 1918, after deducting all disbursements, more than $133,241.97, the county impaired the fund in two respects: (1) By accepting general fund county warrants in payment of the special levies of 1915, 1916 and 1917; and (2) by illegally and wrongfully paying to others than the plaintiffs more than $25,000 out of the special courthouse fund.

Dougan avers that when collecting taxes in 1915, 1916 and 1917, the tax collector received general fund county warrants in payment for the special courthouse taxes as well as in payment for other taxes. General fund county warrants, Dougan says, aggregating more than $45,000, were received from taxpayers in satisfaction of these special taxes. Dougan takes the position that it was unlawful to accept general fund county warrants in satisfaction of the special taxes levied for courthouse purposes, and that by taking such warrants the county in effect borrowed more than $45,000 from the special courthouse fund and then loaned that sum of money to the general fund for the purpose of re-

tiring warrants drawn upon and payable out of the general fund.

It is averred in general terms in the writ that the county has since March 20, 1918, illegally and wrongfully paid out of the special courthouse fund "to others than these plaintiffs" more than the sum of $25,000 "no part of which was payable out of said special courthouse fund." The writ declares that this was equivalent to borrowing $25,000 from the special courthouse fund and that therefore if this sum of $25,000 and the additional sum of $45,000, represented by retired general fund county warrants accepted in payment of special taxes, were restored to the special fund, then more than enough moneys would be available for the payment of Dougan's unpaid warrant drawn on the special courthouse fund. The writ continues by averring that more than the sum of $26,000 is in the general fund and is available for general county purposes and can be used for the purpose of paying the warrant drawn on the general fund for $1,093 and can also be used for the purpose of restoring to the special courthouse fund enough money to pay the special fund warrant for $20,572.47.

In brief, the writ averred that there was in the special courthouse fund on March 20, 1918, a sum amounting to more than $133,241.97, after deducting all disbursements theretofore made; that a sum amounting to more than $45,000 had been in effect borrowed from the special fund in order to pay and retire general fund county warrants; that the sum of $25,000 was unlawfully paid out of the special courthouse fund and in effect was borrowed from it; that $70,000 should be restored to the special courthouse fund; that there is in the county treasury

more than $26,000 belonging to the general fund and available for the purpose of paying Dougan's two unpaid warrants.

The defendants deny that the special courthouse fund contained on March 20, 1918, the sum of $133,241.97. The defendants deny that $25,000 or any moneys whatever were unlawfully paid out of the special courthouse fund. Although the defendants admit that there are moneys in the hands of the treasurer, they deny that any of these moneys can be used for paying the two warrants held by Dougan.

The amended answer contains four further and separate defenses. In the first separate defense it is alleged that on March 20, 1918, the cash on hand in the special courthouse fund derived from the special levies of 1915, 1916 and 1917 amounted to $66,882.82, and the taxes in course of collection amounted to $57,872.64, making an aggregate of $124,755.46. The defendants say that of the taxes, amounting to $57,872.64, which were on March 20, 1918, in course of collection, the sheriff collected up to March 22, 1921, the total sum of $47,361.51 in cash and received county warrants to the extent of $10,376.40. If to the sum of $66,882.82 the cash on hand on March 20, 1918, is added the sum of $47,361.51, cash collected subsequent to March 20, 1918, the total sum will be found to be $114,244.33 derived from the levies of 1915, 1916 and 1917. There was also in the hands of the county treasurer on March 20, 1918, $6,359.65 derived from the levies of 1909, 1910, 1912, 1913 and 1914; and, hence, if this sum be added the county treasurer is chargeable with cash totaling $120,603.98. The defendants say that the whole sum of $120,603.98 has been dis-

bursed and that no more cash remains in the court-house fund.

The defendants refer to the employment of E. E. McClaren, Houghtaling and Dougan as architects and say that under the terms of their employment the sum of $10,047.87 became due and owing to the architects on March 20, 1918 and was payable out of the special courthouse fund; and that therefore the net amount from the levies of 1915, 1916 and 1917 available on March 20, 1918 was $114,707.59. In other words, the defendants aver that $131,755, the price named in the Dougan contract, and $10,047.87, the amount due the architects, aggregated $141,802.87 or $17,047.41 more than the amount of the special courthouse fund on March 20, 1918 "including taxes collected and all that remained to be collected" from the levies of 1915, 1916 and 1917.

The defendants continue by repeating that from the levies of 1915, 1916 and 1917, the cash collected and the taxes which, on March 20, 1918, were in course of collection aggregated $124,755.46, and then they proceed to specify the items of disbursements charged against the special courthouse fund. In March and April 1918, E. E. McClaren was paid $3,559.12; Houghtaling and Dougan were paid $3,394.38; in April, 1918, Dougan was paid $41,546 and in March, 1921, $65,000 and $7,102.48, making a total of $120,603.98. As previously explained the cash which was on hand on March 20, 1918, plus the cash subsequently collected on levies for the year 1917 and on levies for years prior to 1917, aggregated $120,603.98; and, therefore, according to the answer Dougan and the architects have been paid every dollar of that sum and not a

cent of cash now remains in the special courthouse fund.

The defendants proceed with their first separate defense by giving an account of the collections made under the levy of 1918 and the disbursements charged against those collections. As previously explained, the levy of 1918 was made expressly for the courthouse on block 10. The sheriff collected under this levy and turned over to the county treasurer the sum of $21,008.53. The answer lists the items which have been charged against the levy of 1918 and it appears that disbursements amounting to $10,310.39 have been made leaving an unexpended balance of $10,698.14. The defendants say that because the levy of 1918 was made expressly for the Hot Springs courthouse on block 10, this unexpended amount of $10,698.14, was on March 23, 1921, segregated from the special courthouse fund and placed in a fund "to be known as the Hot Springs courthouse fund." The defendants aver that the Hot Springs courthouse can be completed by an expenditure of $75,000 or more, depending upon the finish, and that when so completed the building and land will be worth $250,000; that by reason of inferior work, cheap construction, defective plumbing, absence of a heating plant and failure to install electric light fixtures, it will cost "in excess of $30,000 to complete" the courthouse on block 35 so as to render it suitable for occupancy; that the County Court has determined to sell block 35 and the courthouse on it and to complete the courthouse on block 10; and that it is the purpose of the County Court to expend on the Hot Springs courthouse the balance remaining from the 1918 levy.

The defendants next explain the facts, as under-
stood by the defendants, concerning collections made
in the years 1916, 1917, 1918 and 1919 on the levies
of 1909, 1910, 1912, 1913 and 1914. During the four
years period the sum of $277.77 was collected on the
1909 levy; $174.48 on the 1910 levy; and $588.25
on the 1912 levy; making an aggregate of $1,040.50.
During the same four years period the sum of $3,981.96
was collected on the 1913 levy; and $4,746.22 on the
levy of 1914; making an aggregate of $8,728.18.
The total amount collected on these five levies during
that period of four years was $9,768.68. The de-
fendants say that from these "collections warrants
have been paid to an amount so that the balance re-
maining in said special courthouse fund from the
levies made in 1914" and prior thereto is approxi-
mately $6,359.65, and these moneys the defendants
say have been paid to Dougan.

The defendants further explain in the first sepa-
rate defense that beginning with the year 1913 the
sheriff, who is the tax collector, permitted taxpayers
to turn in county warrants in payment of taxes, in-
cluding taxes levied for courthouse construction.
According to the amended answer "a full statement
of reception of county warrants in payment of taxes
specially levied for courthouse construction is as
follows": 1913, $31,528.61; 1914, $45,856.40; 1915,
$36,862.27; 1916, $20,235.03; 1917, $14,510.23; 1918,
$10,377.77; aggregating $159,370.31. The defendants
say that a portion of the warrants received during
1918 was received prior to March 20, 1918; but that
the defendants have not had an opportunity to make
an exact computation of the amount so received
prior to March 20, 1918.

4. The defendants say that the county, when making levies in 1913 and in subsequent years, took into consideration the fact that county warrants would be presented and received in payment of taxes including special courthouse levies, and that when making the levies the county calculated the amount of cash desired and also calculated the amount of the county warrants which would probably be received in payment of special courthouse taxes and then made a levy sufficiently large to produce such calculated amount of desired cash. In other words, the defendants say that the special courthouse fund actually received as much cash as it would have received if the levies had been originally made on the theory that the special courthouse taxes were payable in cash only; for the reason that if the taxes had been deemed to be payable in cash only the levies would have been lower. This phase of the answer is immaterial. Dougan is entitled to look to the special courthouse fund as it was and as it legally is and is not bound by what might have been but was not done.

In the second separate defense it is stated that in December, 1920, the county would have levied a tax sufficient to raise $50,000 to be used toward completing the Hot Springs courthouse and that the county would also have levied a tax sufficient to produce $14,000 for miscellaneous purposes, including the payment of the expenses of the main suit, but that in a suit brought by Frank Ward in the Circuit Court for Klamath County the County Court was enjoined from levying such proposed taxes. The defendants say that if the county had been permitted to levy the tax of $14,000 it would have had funds available for the payment of the warrant for

$1,093. In its second separate defense it is charged by the defendants that Frank Ward and his associates and the plaintiffs have conspired together to compel the County Court to accept and use the courthouse on block 35 and abandon the courthouse on block 10; and that the suit was brought by Frank Ward "is a part of the general scheme engaged in between" Ward "and his associates and the plaintiffs herein."

5. Obviously all that is said about the proposed levy for the Hot Springs courthouse is entirely foreign to the present inquiry. No part of the second separate defense is material except possibly that portion which refers to the proposal of the county to levy a tax for miscellaneous purposes; and if this minor portion is material at all it is material only to the extent that it relates to the question of whether or not the county treasurer has without just excuse refused to pay the warrant for $1,093. It is stated in the writ that the county treasurer has without just excuse refused to pay, and based upon that allegation it is claimed a fine should be imposed upon the county treasurer. The whole of this separate defense is immaterial so far as it relates to the other unpaid warrant. Although it may be doubtful whether the second separate defense is material or competent for any purpose, we will for the present at least resolve the doubt in favor of the pleading in order that every phase of the controversy possible of determination in this litigation may be presented.

The third separate defense is an extended statement concerning the moneys in the hands of the county treasurer. In this separate defense it is averred that in compliance with the budget law esti-

mates were made of the amounts needed for different purposes for the year 1921, and that the levy was made substantially in conformity with the budget. The items which made up the budget are enumerated in the amended answer; and among the enumerated items appear items for various special funds. This separate defense contains an itemized statement of the moneys belonging to the respective funds. The defendants explain that when the budget was made up it was estimated that the sum of $90,000 would be sufficient to pay the state tax and that the levy was made accordingly. It is also explained in the amended answer that the amount of the state tax actually charged against Klamath County was $127,313.50 or $37,313.50 more than was estimated when the budget and levy were made. It would not serve any useful purpose to give a detailed statement of the third separate defense, but it is sufficient merely to say that this defense admits that the county treasurer has in his hands money in excess of $26,000, but borrowing the language used by the defendants in their brief, the defendants affirmatively say that "the funds in the hands of said treasurer are made up of various special funds specially levied and collected for other purposes than general county purposes and that none of said money is available for the payment of plaintiffs."

The county treasurer's books show that among the different funds is one known as the General and State Tax Fund. This fund at present amounts to $41,682, and it includes: (1) Taxes collected for payment of state taxes of Klamath County; and (2) taxes collected on special levies made in 1917, 1918 and 1919 for the redemption of outstanding warrants. The defendants say that if Dougan's war-

rants are paid out of the General and State Tax
Fund there will not be sufficient moneys with which
to pay the first half of the taxes due from Klamath
County.

The fourth separate defense explains why the
sheriffs received county warrants in payment of
taxes levied for courthouse construction. In 1913
the taxes levied upon property owned by B. S.
Grigsby aggregated $16.10. On February 13, 1913,
Grigsby tendered to C. C. Lowe, the sheriff and tax
collector, $7.98 in cash and four county warrants of
the face value of $7.60 and demanded a receipt in
full for his taxes, claiming that the cash and war-
rants, and a rebate of 3 per cent at that time al-
lowed by statute, entitled him to a receipt in full.
The sheriff refused to accept the warrants. Upon
the petition of Grigsby an alternative writ of *man-
damus* was issued out of the Circuit Court requir-
ing Lowe to accept the warrants or show cause for
not doing so. Grigsby contended that the sheriff
was legally bound to accept the county warrants in
payment "of the following items of the levy made
by the county court": State, general, salary, Cir-
cuit Court, jail, county poor, and courthouse pur-
poses. The levy for courthouse purposes, it will be re-
membered, was a special one made for the construc-
tion of the courthouse on block 10. The litigation
begun by Grigsby terminated on March 3, 1913, by
the issuance of a peremptory writ of *mandamus* com-
manding the sheriff to receive the county warrants
tendered by Grigsby.

No appeal was taken from the judgment rendered
in the Circuit Court; nor was the judgment after-
wards modified or otherwise disturbed by the Circuit
Court. Acting upon the authority of the judgment

rendered in *Grigsby* v. *Lowe,* the successive sheriffs of Klamath County during the years 1913 to 1918 inclusive permitted taxpayers

"to turn in county warrants in payment of taxes levied for all county purposes as well as taxes levied for the purpose of paying the state tax due from Klamath County and during said years, taxes levied for the purpose of new courthouse construction or for the purpose of completing the courthouse on block 10, Hot Springs Addition, were not paid in money to the extent of $159,370.31 but in lieu thereof the tax collector of said county * * received county warrants issued for various purposes in payment of taxes to said amount which had been levied for the purpose of new courthouse construction or the completion of the Hot Springs courthouse."

By prosecuting this proceeding the plaintiffs are attempting to enforce payment of the money decree rendered in the main case. The only fund out of which payment can be enforced is the special courthouse fund; and the only moneys which may be treated as having belonged to that fund are the taxes collected, or in process of collection, on the levies of 1909, 1910, 1912, 1915, 1916 and 1917. The litigants disagree upon the amount which was in the special courthouse fund on March 20, 1918. Dougan says that from the levies of 1915, 1916 and 1917 there remained $133,241.97; the defendants say that the amount, including cash on hand and moneys in course of collection, was $124,755.46.

Dougan says that if the special courthouse fund contained the moneys which rightfully belong to it, and therefore ought now to be in it, there would be in such fund more than enough moneys to satisfy the two unpaid warrants held by Dougan. The plaintiffs say that the special courthouse fund has

been depleted in two particulars: (1) By paying
claims not lawfully chargeable against this fund;
and (2) by receiving county warrants in payment
of special courthouse taxes. The defendants deny
that any moneys were wrongfully paid out of the
special courthouse fund. The defendants admit that
county warrants were received in payment of taxes
levied for courthouse purposes; and consequently
this phase of the controversy becomes important.
The importance of the questions arising out of the
county warrants is emphasized when we remind our-
selves that the defendants claim that the county
treasurer has paid to the architects and Dougan
every dollar of money that was in the special court-
house fund on March 20, 1918 and also every dollar
which since that time has been collected on the levies
of 1916, 1917 and 1918. Moreover, the defendants
claim that among the moneys in the special court-
house fund on October 20, 1918, were moneys col-
lected on the levies of 1913 and 1914, and that al-
though not entitled to these moneys Dougan and
the architects received them. In brief, the defend-
ants say that Dougan and the architects have re-
ceived $120,603.98 and that this sum included all
the moneys which have been collected on the 1915,
1916 and 1917 levies as well as all the moneys which
remained from collections made during the four
years period from 1916 to 1919 inclusive on the
levies of 1909, 1910, 1912, 1913 and 1914. If the
sum of $120,603.98, and this includes the moneys
derived from the levies of 1913 and 1914, is taken
as the maximum amount belonging to the special
courthouse fund, then the fund has been exhausted
and Dougan must fail in this proceeding. But Dou-
gan says and the defendants admit that county war-

rants were received in payment of special taxes levied for courthouse construction; Dougan also says, while the defendants deny, that the acceptance of such warrants was unlawful.

The arguments of counsel, as made in their briefs, have been based upon the assumption that the warrants received in payment of special taxes levied for courthouse construction were warrants drawn upon the general fund. It is stated, however, by the defendants that some of the warrants were not general fund warrants; and from this statement we infer that some of the warrants were drawn on special funds other than the special courthouse fund. In our view it makes no difference whether the warrants so received were warrants drawn on the general fund or on some special fund other than the special courthouse fund.

The propriety of the acceptance of county warrants depends upon the construction to be given to Section 3406, Or. L., which reads as follows:

"County orders shall be redeemed by the treasurer according to the priority of the time of presentment; provided, that such orders, payable out of the county revenue, shall be received in payment of county taxes without any regard to priority of presentment or number; but such treasurer shall not pay any balance thereon over and above such tax, when there are outstanding orders unpaid for want of funds."

6–8. So far as it is material here this section declares that county orders, payable out of the county revenue, shall be received in payment of county taxes. At first blush it might appear from a reading of Section 3406, Or. L., standing alone, that a special tax levied for courthouse construction is a county tax and that all county warrants whether

drawn upon a special fund created by taxes or upon
the general fund created by taxes are warrants pay-
able out of the county revenue and therefore re-
ceivable in payment of taxes levied for courthouse
construction.   Section 3406, Or. L., has a history
and the words "county taxes" as used in this section
must be read in the light of the origin and history of
the section.   This statutory provision was originally
enacted in 1854, and, aside from the addition of the
word "that" after the word "provided" the section
has continued without change to be the statutory law
of this jurisdiction since the date of its enactment in
1854.   This section must be read and construed in
the light of other sections enacted with it by the
same legislative assembly in 1854: See Deady's
Code, pp. 929 and 900 et seq.   The words "county
taxes" are found in many different sections of the
Code (Olson's Compilation), but they do not neces-
sarily mean the same thing in all sections.   It has
been ruled, for example, that a tax levied and col-
lected for the purpose of paying the "state taxes"
is nevertheless in fact "a county tax levied for
county purposes"; *Northrup* v. *Hoyt,* 31 Or. 524,
530 (49 Pac. 754, 756); and yet when Section 3406,
Or. L., is read in the light of other statutory pro-
visions enacted with it in 1854, and when read in
the light of statutory provisions now existing, it
becomes manifest that the words "county taxes" as
used in Section 3406, have a limited meaning and do
not include taxes levied for the purpose of paying
the county's obligation to the state, notwithstanding
such taxes may be said to be, as declared in *North-
rup* v. *Hoyt,* in fact "a county tax levied for county
purposes."   The words "state taxes" are now found
in different sections of our Code (Olson's Compila-

tion), and ever since 1854 they have appeared in statutes dealing with the subject of taxes; and the fact that the words "state taxes" have so appeared makes it plain that when Section 3406 was originally enacted the words "county taxes" were used with the purpose of excluding at least "state taxes" and possibly other taxes. We do not find it necessary at this time to decide whether the language of Section 3406 is further limited so as to exclude a special tax levied for courthouse construction; and hence we prefer to postpone the decision of that question until the case is finally presented on all the facts and we are afforded the benefit of such study and thought as counsel may give to the question. However, it is proper to say that there are strong reasons in support of the argument that the statute does not permit the use of county warrants in payment of special taxes, and that, speaking broadly, county warrants can be used to pay only such taxes as are levied for what Mr. Justice McBride has referred to as "the common and constantly recurring expenditures which go to make up the usual county budget." *Obenchain* v. *Daggett,* 68 Or. 374, 380 (137 Pac. 212, 214). We cannot agree with the contention of Dougan that the opinion rendered in *Obenchain* v. *Daggett* construed Section 3406, Or. L., or must be treated as having directly overruled the conclusion reached by the Circuit Court in *Grigsby* v. *Lowe.* The facts in one case were different from those in the other. Both cases did not deal with the same statute. The reasoning employed in *Obenchain* v. *Daggett* may furnish substantial ground for the contention that special taxes cannot be paid with county warrants but the opinion rendered in the case goes no further than to declare

that cash cannot be taken from a fund of special taxes and used to pay warrants drawn on some other fund. A rule of strict construction is applied to statutes like Section 3406: 27 Am. & Eng. Ency. L. (2 ed.), 752.

9. Throughout this discussion it must be remembered that the taxes levied for courthouse construction were special taxes, and when collected were available for no purpose except the special purpose for which they were levied and collected. Whenever a county warrant drawn upon some other fund was presented and received in payment of the special courthouse taxes it was in the final analysis equivalent to borrowing from the courthouse fund moneys with which to pay the debt of the other fund; and therefore the lending fund stands in the position of a creditor of the borrowing fund and the latter stands in the position of a debtor and hence must pay its debt by restoring to the lending fund the amount borrowed from it. It makes no difference whether we construe Section 3406, Or. L., to mean that county warrants are receivable in payment of both special and ordinary taxes or whether we construe the section to mean that only ordinary taxes are payable in county warrants, for in either event, the borrowing fund must at some time and by some means pay its debt to the lending fund.

The warrants which were received in payment of taxes may be divided into two classes: (1) Those received prior to March 20, 1918; and (2) those received subsequent to that date. Obviously Dougan as a creditor of the special courthouse fund is entitled to have restored to that fund cash in an amount equal to the amount of the warrants received since March 20, 1918. We do not now decide

whether Dougan is entitled to insist upon a restoration being made on account of warrants received prior to March 20, 1918; for we prefer to postpone decision of that question until such time as we are advised of all the material facts and are given the benefit of the views of counsel for the respective litigants.

10. In view of the judgment rendered in *Grigsby* v. *Lowe* and the uninterrupted observance of that judgment by Lowe and his successors in office, the acceptance of warrants must be treated as payment even though it be ultimately decided that Section 3406 does not entitle a taxpayer to pay a special tax with a county warrant. Lowe was the sheriff of Klamath County and the matter litigated involved in a large measure a public question. Lowe and his successors in office turned over to the treasurer the warrants received by them and were given credit for the amount of such warrants. The warrants were canceled and retired and the indebtedness of the county was satisfied and lessened to the extent of the amount of the warrants so retired. To say in these circumstances that the sheriffs should account in cash to the county or to Dougan to the extent of the warrants received in payment of the special courthouse taxes, or to say that the special courthouse taxes were not paid and that the taxpayers still owe taxes to the extent of the warrants surrendered by them would be a travesty upon right and justice. We cannot agree with any contention that the taxpayers must again pay or that the sheriffs must pay; for the taxpayers have already paid by surrendering the county warrants and the sheriffs have duly accounted for the payments by delivering the warrants to the treasurer and the county has

been paid by the reception and cancellation of these warrants: See *Rose* v. *Port of Portland,* 82 Or. 541, 574 (162 Pac. 498); 23 Cyc. 1270; 15 R. C. L. 1030.

Thus far we have decided that restoration must be made to the special courthouse fund to the extent that warrants have been accepted since March 20, 1918, although we have left open and undecided the question as to whether or not restoration must be made on account of warrants received before that date. We next inquire whether there are now in the hands of the county treasurer moneys with which restoration can be lawfully made. Dougan says that the treasurer has moneys which are available; but defendants say that although the treasurer has moneys none of such moneys are available to Dougan. According to the answer most, if not all, of these moneys are special taxes which were levied and collected for special purposes, and therefore the defendants say such taxes cannot be diverted to some other purpose. Moreover, the defendants claim that if Dougan is paid out of the moneys now in the hands of the county treasurer not enough will remain to pay the "state taxes."

11. Ordinarily moneys collected on a levy made for a special purpose, for example, the construction of a courthouse, cannot be diverted from such special purpose; and therefore if all the moneys in the hands of the county treasurer belong to special funds, as such funds are defined in *Obenchain* v. *Daggett,* 68 Or. 374 (137 Pac. 212), it is certain that moneys cannot be taken from any special fund which has not been a borrower of the special courthouse fund, and it is a debatable question as to whether restoration can be made to the special courthouse fund by taking from another special fund moneys collected on

a special levy, made for a different and particular purpose, even though the latter special fund is a debtor of the special courthouse fund. In other words, it is certain that restoration cannot be made by taking moneys from a nondebtor special fund and it is a debatable question whether restoration can be made by taking moneys from a debtor special fund if that fund contains no moneys except moneys collected on a levy made for a definite and particular purpose. The question as to whether moneys raised on a special levy and now in a debtor special fund can be taken from that fund and transferred to the special courthouse fund is a question which we leave open until the cause is presented on the merits.

12. If there are not enough moneys in the hands of the treasurer to pay both the "state taxes" and Dougan, then Dougan's claim must be subordinated to that of the state; for the obligation of the county to the state must be first satisfied.

From what we have thus far stated it follows that the demurrer must be overruled. The amended answer, by denials and by affirmative allegations, presents questions of fact which must be determined before a judgment can be rendered for Dougan or for the defendants; and hence the motion for a judgment on the pleadings must be denied.

If it should develop that there are now in the treasury no moneys available with which to make restoration to the special courthouse fund, then it may be that Dougan's only remedy, if he has any, is to compel the levy of special taxes for the purpose of restoring moneys which in effect were borrowed from the special courthouse fund.

The County Court properly segregated from the special courthouse fund the moneys which were collected on the levy of 1918; for that levy was made expressly for the Hot Springs courthouse.

If the county should conclude not to proceed further with the Hot Springs courthouse and decide to dispose of its interest in that property, and if any moneys collected on the 1918 levy should remain unexpended, then it is possible that such unexpended moneys would of necessity be transferred to the general fund and become available to Dougan. If, however, the County Court lawfully proceeds with the construction of the Hot Springs courthouse, then the moneys collected on the 1918 levy can be used for no purpose except the construction of the Hot Springs courthouse. It is admitted that the Hot Springs courthouse is not completed. It is alleged in the amended answer that the courthouse on block 35 cannot be made suitable for occupancy without the expenditure of approximately $30,000; and that the County Court has determined to sell block 35 and complete the building on block 10. While we wish to make it plain that we do not attempt to say or even intimate whether either one of the two buildings must, on account of acts done by the County Court, be deemed *the* courthouse of the county, and while the law clearly gives to the County Court the power to provide a courthouse building when necessary, yet it is proper in this connection to suggest that County Courts are not empowered to build courthouses by wholesale; and consequently if it cannot be said that, because of what has been already done, one and not the other of the two buildings is *the* courthouse of the county, then the

legally constituted authorities must decide upon the
selection of one building as *the* courthouse for
Klamath County; for any taxpayer can prevent the
maintenance of two buildings as courthouses when
one is amply sufficient for courthouse purposes. If
one building must be deemed now to be *the* court-
house or is selected as *the* courthouse, it may never-
theless be lawful and proper to expend moneys on
the other with the view of disposing of it to ad-
vantage; but of course that question is not now
presented for decision.

The motion to strike, the motion for a judgment
on the pleadings and the demurrer to the amended
answer are overruled; and the plaintiffs are al-
lowed ten days within which to file a reply.

DEMURRER AND MOTIONS OVERRULED. DISMISSED.

BENSON, J., not sitting.

---

Motion to dismiss appeal denied December 27, 1921, argued October
5, affirmed November 13, 1923.