Argued and submitted April 8, Madras High School, Madras, affirmed July 29, 2015, petition for review dismissed January 27, 2016 (358 Or 551)

Michelle ROSSOLO,
*Plaintiff-Appellant,*

*v.*

MULTNOMAH COUNTY ELECTIONS DIVISION
and Tim Scott, Director,
*Defendants-Respondents,*

*and*

METRO,
*Intervenor-Respondent.*

Multnomah County Circuit Court
140100046; A156429

357 P3d 505

James T. McDermott argued the cause for appellant. On the briefs were Peter O. Watts and Jordan Ramis PC.

William F. Gary argued the cause for respondents. With him on the joint brief were Sharon A. Rudnick, Harrang Long Gary Rudnick P.C., and Jacqueline A. Weber.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

Plaintiff filed an action in the circuit court under ORS 246.910 to obtain review of a decision by the Multnomah County elections officer.[1] The decision rejected plaintiff's prospective petition to refer parts of a county transient lodging tax ordinance to the voters. The reviewing court granted summary judgment to the elections officer, Scott, and the county. The court concluded that the refusal to accept the prospective petition was lawful because the voters' authority to refer county enactments under the Oregon Constitution, state statutes, and local ordinances only extends to legislation, and the matter sought to be referred was administrative, and not legislative, in character. On appeal, plaintiff contends that the reviewing court's decision was incorrect as a matter of law because, if the matter is administrative in character, the county elections code allows referral of administrative ordinances, and, in any event, the matter sought to be referred was legislative in character, and appropriate to refer to the ballot under the Oregon Constitution. As explained below, we conclude that the reviewing court's decision was correct and, accordingly, affirm.

Pursuant to Article VI, section 10, of the Oregon Constitution, county voters have the power to "adopt, amend, revise or repeal a county charter." In addition, "[t]he initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter[.]" *Id.* As the Supreme Court explained in *Multnomah County v. Mittleman*, 275 Or 545, 551, 552 P2d 242 (1976), Article VI, section 10, "reserve[s] to county voters with respect to county tax legislation the same 'referendum powers'

---

[1] ORS 246.910(1) provides:

"A person adversely affected by any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, or by any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made."

previously reserved to state voters with respect to state tax legislation[.]" Those include the referendum powers set forth in Article IV, section 1(3)(a),[2] and section 1(5),[3] of the Oregon Constitution, and the implicit referendum authority for an act "regulating taxation or exemption" in Article IX, section 1a, of the Oregon Constitution.[4]

In this case, plaintiff sought to refer portions of an ordinance amending county code provisions that regulated transient lodging taxes. The question presented in this case is whether the measure that plaintiff sought to refer qualifies as a "part thereof" of "legislation" that can be referred under the express and incorporated terms of Article VI, section 10, and the applicable statutes, charter provisions, and ordinances implementing that referendum authority. To address that question, we turn next to the specifics of the proposed referendum, the legal conclusions of the reviewing court, and the contentions of the parties on appeal.

The ordinance provisions plaintiff sought to refer are the culmination of a series of contracts and policy enactments by the county relating to the mutual imposition,

---

[2] Article IV, section 1(3)(a), provides:

"The people reserve to themselves the referendum power, which is to approve or reject at an election any Act, or part thereof, of the Legislative Assembly that does not become effective earlier than 90 days after the end of the session at which the Act is passed."

That part of Article IV was originally adopted in 1902 as Article IV, section 1. In 1906, a separate provision was added as Article IV, section 1a, which provided, in part, that

"[t]he referendum may be demanded by the people against one or more items, sections, or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act."

Article IV, sections 1 and 1a, were modified in 1968 through popular adoption of a constitutional amendment referred by the legislative assembly, HJR 16 (1967), and restated as Article IV, section 1(3)(a).

[3] Pursuant to Article IV, section 1(5),

"[t]he initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district."

[4] Article IX, section 1a, provides, in part, that "[t]he Legislative Assembly shall not declare an emergency in any act regulating taxation or exemption." In *Mittleman*, the Supreme Court concluded that the referendum powers reserved to county voters by Article VI, section 10, included the preclusion of an emergency clause in any act regulating taxation under Article IX, section 1a. 275 Or at 555.

collection, and distribution of transient lodging taxes with the City of Portland (city). In 2001, the county, the city, and Metro[5] entered into a visitor facilities intergovernmental agreement that obligated the parties to collect and distribute public revenues (including transient lodging taxes and vehicle rental fees) to subsidize improvements to and operation of particular regional tourist facilities (including the Oregon Convention Center, the Portland Center for Performing Arts, and the stadium now known as Providence Park) and the visitor and hospitality industry.[6] The county board then adopted Ordinance No. 957, finding that the ordinance was "necessary to conform the code to the Visitor Facilities Intergovernmental Agreement with the City of Portland and Metro." The ordinance continued a transient occupancy tax of 11.5 percent of the rent charged by hotels, dedicating portions of the tax proceeds to the county general fund and various special funds, including an excise tax fund to be used for subsidizing particular regional tourist facilities, all as provided in the intergovernmental agreement.

Through the years, the governmental funding priorities and debt obligations for tourism-related facilities and programs changed. In 2013, the parties entered into an Amended and Restated Visitor Facilities Intergovernmental Agreement (VFIGA) under the authority of ORS 190.010. The VFIGA revised and updated different tourism-related projects and recast the priorities and obligations of the parties. It obligated the city to impose and dedicate a portion of its transient lodging taxes, and the county to likewise dedicate parts of its transient lodging taxes and vehicle rental fees, to various dedicated funds (including the Visitor Facilities Trust Account (VFTA) and the Excise Tax Fund) for particular tourism-related expenditures. One of the agreed-upon expenditures from the VFTA was to pay for Metro's financing costs for bonds for a part of the costs to construct

---

[5] Metro is a metropolitan service district in the Portland urban area that has authority under its charter and state statutes, among other things, to construct and operate "major cultural, convention, exhibition, sports and entertainment facilities." ORS 268.310(4).

[6] Under ORS 190.010, a "unit of local government may enter into a written agreement with any other unit or units of local government for the performance of any or all functions and activities that a party to the agreement, its officers or agencies, have authority to perform."

a privately-owned hotel adjacent to the Oregon Convention Center (OCC) "to bring additional national convention business to the OCC."[7] The VFIGA provides that the convention center hotel bond debt service is the fourth of thirteen spending priorities for the VFTA. Other spending priorities were also changed from the earlier agreement. The county committed to deposit tax collections into the VFTA, and specifically agreed to make payments from the VFTA to Metro for the hotel project bonds.

In particular, the county agreed that, "[w]ithin ninety (90) days of execution of this Agreement, the County will adopt an ordinance amending Multnomah County Code Chapter 11 consistent with this Agreement." In addition,

"[t]he County pledges [various transient lodging tax proceeds] to pay the OCC Hotel Project Bonds. The pledge is valid and binding from the date Metro signs an OCC Hotel Project Development Agreement, and will remain in effect until the OCC Hotel Project Bonds are fully paid. The [various transient lodging tax proceeds] pledged are immediately subject to the lien of the pledge, and * * * that lien is, and will remain, superior to other claims and liens."

The county agreed to maintain the transient lodging tax funds "in effect until all OCC Hotel Project Bonds have been paid or the County has transferred sufficient funds to Metro to defease the OCC Hotel Project Bonds." Finally, the VFIGA required that,

"[s]o long as the OCC Hotel Project Bonds are outstanding, and this Agreement is in effect, the obligations of the County to (i) collect the taxes imposed by Multnomah County Code 11.410(E), and (ii) maintain the TLT Net Revenues and transfer them to Metro to pay the OCC Hotel Project Bonds, as provided in this Agreement, may not be terminated for any reason, including a breach by any Party of its obligations under this Agreement or any amendment to this Agreement."

On September 19, 2013, the county board of commissioners adopted Resolution No. 2013-130, approving the

---

[7] The recitals to the 2013 VFIGA explained that Metro's willingness to issue project bonds to fund the hotel was conditioned on the city and the county continuing to impose transient lodging and motor vehicle rental taxes.

VFIGA, and further resolving that the board would amend Multnomah County Code (MCC) chapter 11 "as necessary to effect the County's obligations as set forth in the" VFIGA.

Accordingly, the county adopted Ordinance No. 1206 on December 19, 2013. The ordinance amended various parts of MCC chapter 11, related to revenue and taxation, to be consistent with the county's obligations under the VFIGA. Among other things, the ordinance extended the time that the vehicle rental fee surcharge remained in effect, allocated a three percent transient lodging tax surcharge to the Excise Tax Fund for particular spending priorities, allocated a two and one-half percent transient lodging tax surcharge to different types and priorities of expenditures, including debt service on the convention center hotel bonds, and extended its time in effect, allocated specific transient lodging city and county taxes generated from occupancies at the convention center hotel to the VFTA, added new exemptions from the transient lodging tax, and specified violations of the code for which fines might be imposed.

On December 20, 2013, plaintiff filed a prospective petition with the county to refer to the voters three provisions in Ordinance No. 1206, each of which addressed the use of the VFTA to pay for debt service on Metro's convention center hotel bonds. The first provision sought to be referred amended MCC section 11.401(E) to state that the county two and one-half percent transient lodging tax surcharge dedicated to the VFTA would continue in force as long as the convention center hotel bonds are outstanding.[8]

_____

[8] Specifically, the prospective petition would delete the phrase "and (3)" in the Ordinance No. 1206 amendment to MCC section 11.401(E):

"A surcharge *rate* of the tax imposed by subsection (A) is equal to 2.5% and will be allocated to the VFTA that is separate from the Excise Tax Fund, **and dedicated to the expenditures specific in subsection 11.402(B).** *This 2.5% surcharge will terminate if the 2.5% motor vehicle rental tax surcharge imposed by §11.301(C) is terminated before issuance of the Bonds.* **This surcharge shall remain in force as long as the bonds described in subsection 11.402(B)(2) [debt service on bonds for the Oregon Convention Center, Portland Centers for the Arts, and Providence Park]** and (3) [debt service for the Oregon Convention Center Hotel Project Bonds] **are outstanding."**

Ordinance No. 1206 (deletion in italics; additions in bold; referendum deletion underlined).

The second provision excluded the specific three percent surcharge taxes collected from any convention center hotel from payment to the Excise Fund, and instead directed that those specific taxes be paid into the VFTA to be used for the expenditures specified in MCC sections 11.402(B) (1) to (5) (including to "Metro for payment of debt service on the Oregon Convention Center Hotel Project Bonds").[9] The final provision plaintiff sought to refer was the authorization to spend a portion of the two and one-half percent transient lodging tax surcharge in the VFTA on the Oregon Convention Center Hotel Project Bonds as the third priority of expenditure from that fund.[10]

---

[9] Section 6 of Ordinance No. 1206 amended MCC section 11.402(A)(2) to provide:

"The county will pay from the proceeds of the surcharge that is allocated to the Excise Tax Fund as set forth in paragraphs (a) through (e) below, with the exception of taxes collected by an Oregon Convention Center Hotel to support bond repayment as specified in (B)(3) of this section, which taxes will be deposited into the VFTA."

(Referendum deletion underlined.)

[10] Section 6 of Ordinance No. 1206 also amended MCC section 11.402 to provide:

"(B) The 2.5% surcharge described by section 11.410(E) and allocated to the VFTA shall be collected and distributed according to the terms of the Visitor Facilities Intergovernmental Agreement between the City, County and Metro. Said distribution shall be made in the following order of priority in amounts specified in the Visitor Facilities Intergovernmental Agreement:

"(1) Before paying the tax imposed by subsection (E) as required by § 11.407, the operator may deduct an amount equal to 5% of the portion of the tax allocated to VFTA. This 5% may be retained by the operator as reimbursement for expenses for collecting the tax.

"(2) To the City of Portland for payment of debt service on bonds issued for the Oregon Convention Center, Portland'5 Centers for the Arts, and Civic Stadium (now known as Jeld-Wen Field).

"(3) To Metro for payment of debt service on the Oregon Convention Center Hotel Project Bonds;

"(4) For support of Operations, Programs, Services, Capital Improvements and Marketing related to:

"(i) Oregon Convention Center,

"(ii) County Visitor Facilities,

"(iii) Enhanced Oregon Convention Center Marketing,

"(iv) Convention Visitor Public Transit Passes,

"(v) Visitor Development Fund, Inc.,

"(vi) Portland'5 Center for the Arts, and

"(vii) Rose Quarter Facilities and City Tourism Support;

On December 31, 2013, Scott, the county elections officer, rejected the prospective petition on the ground that "[t]he subject of the Petition * * * relates to the exercise of the Board of County Commissioner's Executive and Administrative powers" and thus "does not meet constitutional or legislative requirements." Plaintiff appealed that order to circuit court under ORS 246.910(1). The parties filed cross-motions for summary judgment, and the reviewing court granted defendants' motion and denied plaintiff's motion, ruling that

> "Ordinance 1206-and particularly those portions plaintiff seeks to have submitted to county voters through her proposed referendum-simply implements yet one more administrative determination by the Commissioners regarding how tourism related revenues will be expended for the promotion and support of tourism in Multnomah County and the greater Portland metropolitan area. As Ordinance 1206 is an administrative act, not a legislative one, * * * the ordinance is not properly the subject of a referendum."

According to the court, the "proposed referendum * * * pertains to an administrative act of the Multnomah County Board of Commissioners." The court incorporated its summary judgment order into a general judgment in favor of defendants.

On appeal, plaintiff contends that the county's election ordinances permit a referendum on any enactment that is an "ordinance," without regard to the legislative or administrative character of the proposition. For that reason, she claims that the court erred in not ordering the processing of the proposed referendum even if the referendum is administrative in character. Alternatively, plaintiff asserts that the ordinance is "legislative" in nature under Article VI, section 10, and that the court erred in concluding otherwise.

In response, defendants contend that the county could not expand the initiative and referendum authority of its voters beyond that conferred directly by Article VI, section 10, and, even if the county could authorize referenda on

---

"(5)   The Restricted Reserve and Bond Redemption Reserve."
(Referendum deletion underlined.)

administrative matters, it did not do so.[11] Defendants argue that the court did not err in classifying the proposed referendum matter as administrative because Ordinance No. 1206 and its portions to be referred implement legislative policy already established in the county code. We conclude that the county code does not permit the referral of administrative propositions, and that the portions of Ordinance No. 1206 sought to be referred are administrative, not legislative, in character, so that the reviewing court did not err in upholding the county's refusal to process the referendum petitions.

Plaintiff asserts that the county has home-rule authority to expand the type of measures subject to the initiative or referendum process, and has done so in its election code. According to plaintiff, the county election code provisions allow an initiative or referendum on "county legislation," which the code defines as "any ordinance," so that any law adopted as an "ordinance" may be referred, even if the ordinance pertains to administrative matters. We are not persuaded by that contention.

---

[11] Defendants initially contend that the appeal is moot. *See Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993) (case is moot when the "court's decision no longer will have a practical effect on or concerning the rights of the parties"). In the proceedings below, plaintiff and the county stipulated to a judicial order. That order allowed plaintiff to circulate the prospective petition for signatures. Under *former* MCC section 5.104(D) (2001), *renumbered as* MCC section 5.103(D) (2015), "[a]ny petition to refer legislation adopted by the Board must be submitted for signature verification not more than 90 days after the Board's adoption of such legislation." Defendants contend that signed referendum petitions were not submitted to defendant Scott for signature verification by March 19, 2014, the expiration of the 90-day period. Accordingly, defendants assert that the measure went into legal effect, and cannot now be referred. *See State et al v. Gibson*, 183 Or 120, 122-23, 191 P2d 392 (1948) (statute prescribing deadline for filing referendum petition is mandatory and, if a petition is not filed within that time, the ordinance becomes a law and is not referable). Plaintiff contends that the petitions were timely submitted to defendant Scott. Plaintiff's counsel represented to the reviewing court that "we've tried to turn in our signatures and they've refused to accept them—*** we've repeatedly *** tried to turn in our signatures so that we could preserve our record." Plaintiff sought an order compelling the county to accept the petitions and verify the signatures. The county's counsel responded that there was no need to verify signatures because, if "the Court of Appeals determine[s] that it was an appropriate referendum *** [it would] likely fashion [an associated] remedy[.]" We conclude that the record is insufficient to allow a conclusion that the petitions were not submitted within the required time and that the plaintiff is without any remedy. For those reasons, we decline to dismiss the case as moot.

First, the Multnomah County Charter vests all powers of the county (including the power to take administrative actions) in the board of county commissioners, except in limited circumstances. Section 2.20 provides that,

> "[e]xcept as this charter or a state constitutional or statutory provision regarding the initiative and referendum provides to the contrary, the legislative power of the county shall be vested in and exercisable only by the board of county commissioners. Any other power of the county not vested by the charter elsewhere shall be vested in the board but may be delegated by it."

Thus, under the charter, legislative authority can be undertaken by initiative or referendum. Administrative authority, however, is vested exclusively in the board of county commissioners unless specifically delegated by the board or conferred by the charter to a different entity. Plaintiff points to no specific delegation by the county board to the voters to make administrative decisions of any sort. Nor does the charter confer that authority, except for section 10.40, which provides:

> "Action by the board regarding a public improvement of the county shall be subject to the referendum in the same manner as legislative ordinances of the county."

We infer from that provision, in the context of charter section 2.20, that only "legislative ordinances" and public improvement actions can be "subject to the referendum" under the county charter. Thus, plaintiff's contention that administrative ordinances may be referred to the voters is inconsistent with the powers vested by the county charter.

Furthermore, even if the board of county commissioners could generally delegate to the voters the authority to take administrative actions by direct legislation, the board has not done so in its election code. The election code provides for the filing of a prospective petition for "referendum for county legislation," MCC § 5.101(A), and requires that, if sufficient signatures are gathered, the "referendum measure will be submitted to the electors," MCC § 5.104(I).[12] "County legislation" is defined by MCC section 5.100 to be

---

[12] All references to the Multnomah County Code are to the provisions of the code in effect at the time of the judgment under review. The county has since amended and renumbered its election laws. Ordinance No. 1215 (Mar 19, 2015).

"[a]ny ordinance that has been or lawfully may be enacted by the county, and any proposed amendment, revision or repeal of the Charter. It does not include any property tax or bond measure or any emergency ordinance."

Plaintiff reasons that "[a]ny ordinance * * * enacted by the county" is any enactment by the county that is captioned or styled to be an ordinance, including ordinances that are administrative, and not legislative, in character. However, that is not the meaning of the term "ordinance" as used in the county code. MCC section 1.002 provides:

"The following definitions and rules of construction shall be observed, unless inconsistent with the intent of the Board of Commissioners or the context clearly requires otherwise.

"* * * * *

"***ORDINANCE.*** A Board exercise of legislative authority granted by the Charter and state law.

"* * * * *

"***RESOLUTION.*** A Board exercise of administrative authority granted by the Charter and state law, or authorized by ordinance."

(Boldface and emphasis in original.) Thus, "county legislation," subject to initiative and referral, requires the "exercise of legislative authority" as opposed to the "exercise of administrative authority" that is taken ordinarily by resolution. Plaintiff's proposed referral of part of Ordinance No. 1206, if administrative in nature, is not authorized by MCC section 5.101.

Plaintiff next contends that, even if the county election code does not allow referral of administrative matters, the portions of Ordinance No. 1206 she seeks to refer are legislative in nature and, therefore, within the referendum power reserved to county voters under Article VI, section 10, which provides, in part:

"The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to *legislation passed by counties* which have adopted such a charter

\* \* \*. To be circulated, referendum or initiative petitions shall set forth in full the charter or *legislative provisions proposed for adoption or referral.* \* \* \* In a county a number of signatures of qualified voters equal to but not greater than four percent of the total number of all votes cast in the county for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition shall be required for a petition to order a *referendum on county legislation or a part thereof.*"

(Emphases added.)

We construe the meaning of a provision added to the constitution after its original enactment by examining its text in context, and, if necessary, the enactment history and other aids to construction. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). The text of Article VI, section 10, directly states that the referendum power only applies to "legislation passed by counties" and to "legislative provisions," that is, provisions that themselves are legislative in nature, even if the proposed referendum is "on county legislation or a part thereof." The parties frame the issue accordingly—debating whether the parts of Ordinance No. 1206 sought to be referred are legislative in character. We assume, for purposes of this case, that the authority to refer parts of a county ordinance under Article VI, section 10, exists only if the parts of the ordinance create policy that is legislative in character.[13]

---

[13] We express no opinion on whether the referendum power reserved for "any Act, *or part thereof,* of the Legislative Assembly" under Article IV, section 1(3)(a), requires that a referred "part" of an act be legislative, and not administrative, in nature. (Emphasis added.) As noted, that part of Article IV was originally adopted as Article IV, section 1a, in 1906: "The referendum may be demanded by the people against one or more items, sections, or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act." According to published accounts of the measure before the June 1906 election, the purpose of the first sentence of proposed Article IV, section 1a, was to allow referral of single items in appropriation bills passed by the legislature. As noted on page 6 of the February 26, 1906, edition of *The Morning Oregonian*,

"[t]here is a proposed constitutional amendment to be voted on in June, whose purpose is to give the people the power to demand the referendum upon single items, sections or parts of a bill passed by the Legislature \* \* \*.

"\* \* \* \* \*

   In classifying an enacted or proposed law as legislative in character (and subject to the initiative and referendum provisions in the Oregon Constitution) and not executive, administrative, or adjudicative in nature (and outside the scope of those provisions), Oregon courts assess the law to determine if it makes policy of general applicability and is more than temporary in duration (and is thus legislative in nature), or if it applies previous policy to particular actions, or is otherwise compelled in substance or process by predicate policy (and is thus executive, administrative, or adjudicative in nature).

   Thus, in *Long v. City of Portland*, 53 Or 92, 100-01, 98 P 149 (1908), *reh'g den*, 98 P 1111 (1909), the court determined that an ordinance of the City of Portland establishing a license fee for the operation of vehicles was referable, reasoning:

> "The only acts of the council that are subject to the referendum, by Section 1a, Article IV, are such as come within the term 'municipal legislation.' Legislation as here contemplated must be considered in the sense of general laws, namely, rules of civil conduct prescribed by the lawmaking power and of general application. By Opinion of the Justices, 66 N. H. 629 (33 Atl. 1076), the law is said to be a rule—not a transient, sudden order to and concerning a particular person, but something permanent, uniform, and universal. The action of a municipal council may relate to

---

   "The effect of this amendment, if adopted, may best be shown by illustrations. If this section should become part of the constitution, the people could demand the referendum upon any item of an appropriation bill, or any section, part of a section, or several sections, of any act passed by the Legislature. Thus, if this clause had been in the constitution last year, the referendum petition which held up the million-dollar appropriation bill could have been so framed as to apply only to the most objectionable features of that bill, and the remaining appropriations could have been left undisturbed."

*See also Rose v. Port of Portland*, 82 Or 541, 562, 162 P 498 (1917) (quoting from an argument by the People's Power League of Oregon, accompanying a tentative draft of proposed Article IV, section 1a, that "[t]he adoption of this amendment will give the people power to control salaries of county and district officers").

   In the years following the adoption of Article IV, section 1a, single appropriations were referred by petition for a statewide vote. In the 1908 election, appropriations for armories and the state university were voted upon, with the armories losing and the university winning approval. University appropriations were the subject of election in the 1912 general election and the 1913 special election. James D. Barnett, *The Operation of the Initiative, Referendum, and Recall in Oregon* 244, 250 (1915).

questions or subjects of a permanent or general character, or to those which are temporary and restrictive in their operation and effect; and ordinarily an ordinance relates to the former, while the latter may be adopted by resolution. The former must be enacted with all the formality required by the charter, while the latter may be adopted with less formality, and its legal effect determined less strictly, unless the charter otherwise provides. * * *

"Whatever may be the requirement as to the form of enactment, the former is municipal legislation, while the latter is not. In *Shaub v. Lancaster City*, 156 Pa. 362, 366, (26 Atl. 1067, 1068: 21 L. R. A. 691), it is said: 'But there is a well-marked distinction between acts that are legislative, and that lay down a rule of action for the citizens or the city, and acts that relate to daily administration of municipal affairs. The latter may well be described as "business" to be transacted by councils, and may be properly left to them to dispose of by "order or resolution."' And this distinction is not destroyed by reason of the fact that by the Portland charter much of the latter class of business must be accomplished by ordinances, and not by resolutions. This will not bring the latter within the classification of municipal legislation."

*See also Monahan v. Funk*, 137 Or 580, 586, 3 P2d 778 (1931) (ordinance authorizing purchase of property for crematorium, adopted after voter approval of bonds for the project, is not referable; reasoning that ordinance "prescribes no rule of civil conduct; it is not permanent, uniform or universal in its application to the general public" and "was a carrying out of the business of the council * * *"); *Hebring v. Brown*, 92 Or 176, 180, 180 P 328 (1919) (no referendum right to vote on ratification of the Eighteenth Amendment to the United States Constitution because referendum applies "only to proposed laws, and not to legislative resolutions, memorials and the like").

In a number of decisions, Oregon courts have concluded that an enactment of a local governing body that implements prior policy is not referable. *See Yamhill County v. Dauenhauer*, 261 Or 154, 156, 492 P2d 766 (1972) (proposed initiative measure precluding construction of bridge not proper subject for an election because the voters earlier approved bonds for the bridge and construction of the bridge

was approved previously by the county board); *Tillamook P. U. D. v. Coates*, 174 Or 476, 481, 149 P2d 558 (1944) (ordinance approving issuance of bonds previously approved by voters is "administrative rather than legislative in character"); *Whitbeck v. Funk*, 140 Or 70, 75, 12 P2d 1019 (1932) (ordinance authorizing purchase of property for public market was not referable because of a prior ordinance approving the debt financing for the facility; concluding that the ordinance "does not enact legislation" but "is merely carrying out a business transaction designating real property for use as a public market"); *Roberts v. Thies*, 70 Or App 256, 260, 689 P2d 356 (1984), *rev den*, 298 Or 553 (1985) (ordinance authorizing acquisition of property for a park was administrative because prior municipal legislation and land use plans authorized development of the park).

Analogously, a particular local government decision is not subject to direct legislation if it is required to be made by a prescribed nonlegislative process. Thus, in *Foster v. Clark*, 309 Or 464, 790 P2d 1 (1990), the court held that a proposed initiative measure renaming a Portland city street constituted administrative activity, rather than legislative activity, and thus, was not subject to the initiative process. The court noted that the Portland City Code contained "a complete scheme for changing Portland city street names," representing a "completed legislative plan" so that street renamings "become administrative acts, not legislative." *Id.* at 473. Thus,

> "[a] city's practice of naming or renaming streets only through specific ordinances may establish that the activity is 'legislation' subject to the initiative and referendum process. Another city's practice of naming and renaming streets only through a process akin to that established [in Portland's code] may establish that the activity is 'administrative' and not subject to the initiative and referendum process. The point is, whether a particular municipal activity is 'administrative' or is 'legislation' often depends not on the nature of the action but the nature of the legal framework in which the action occurs."

*Id.* at 474; *see also Lane Transit District v. Lane County*, 327 Or 161, 168-69, 957 P2d 1217 (1998) (in light of "completed legislative plan for the appointment, compensation,

and removal of a transit district general manager" in state statutes, proposed measure reducing the salary of a transit district general manager was "an administrative task under the existing legal framework" and not the proper subject of an initiative process); *Dan Gile and Assoc., Inc. v. McIver*, 113 Or App 1, 5, 831 P2d 1024 (1992) (determining that a zone change for a parcel is not subject to referendum because it is quasi-judicial and not legislative in character, and noting that, "[w]hen the only decision to be made is a land use decision, to which specific land use provisions and requirements must be applied, the governing body must, and the electorate cannot, follow the procedures or be confined to the substance of those requirements"); *cf. Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.*, 287 Or 591, 602-03, 601 P2d 769 (1979) (whether road vacation ordinance adoption process is adjudicative, rather than legislative, for purposes of review under the writ of review statutes, depends upon whether "the process is bound to result in a decision," "the decision is bound to apply preexisting criteria to concrete facts," and the decision "is directed at a closely circumscribed factual situation or a relatively small number of persons").

Tested by those standards, the parts of Ordinance No. 1206 sought to be referred are administrative, rather than legislative, in character and, accordingly, are not subject to the referendum process. The proposed measure precludes a particular expenditure of transient lodging taxes, a closely circumscribed factual situation, and does not establish or repeal general policies applicable to expenditures of tax funds. The proposed measure does not legislate the imposition of or exemption from a tax, so as to be implicitly subject to referendum under Article IX, section 1a.[14] Most importantly, adoption of the pledge of tax funds and the convention center hotel bond funding portions of the ordinance were preordained and compelled by the previously adopted

---

[14] *See Oregonians for Health and Water v. Kitzhaber*, 329 Or 339, 347, 986 P2d 1167 (1999) (law allowing condemnation of property for corrections facility is not a law "regulating taxation or exemption" under Article XI, section 1a, so as to be subject to referendum); *cf.* ORS 203.055(1) ("[A]ny ordinance, adopted by a county governing body under ORS 203.035 and imposing, or providing an exemption from, taxation shall receive the approval of the electors of the county before taking effect.").

intergovernmental agreement and board resolution.[15] In contrast, legislative choices, whether by a local governing body or its voters, are discretionary in nature, and are not required to be made. Thus, both the substance of the proposed measure and the "nature of the legal framework in which [the adoption of the convention center hotel financing provisions] occurs" compel the conclusion that the proposed measure is administrative in nature. *Foster*, 309 Or at 474. The reviewing court did not err in upholding the county's refusal to process the prospective petition.

Affirmed.

---

[15] There is some question whether the county voters had the "power to rescind [the pledge of tax funds] approval in a later vote." *Dauenhauer*, 261 Or at 156. ORS 287A.325(1)(a) provides that "[i]t is a matter of statewide concern that certain covenants made by public bodies regarding a pledge of revenues to secure bonds not be impaired by subsequent initiative or referendum measures." ORS 287A.325(3) states that "[a]n elector-approved initiative or referendum measure that purports to change ordinances or resolutions affecting rates, fees, tolls, rentals or other charges has no force or effect if giving force and effect to the change would impair existing covenants made with existing bond owners."